36 C.C.P.A. (Patents)

### ADAM et al. v. ROTH.
### Patent Appeal No. 5525.

United States Court of Customs and Patent Appeals.

March 1, 1949.

Thomas A. Banning, Jr., of Chicago, Ill., for appellants.

Roberts B. Larson, of Washington, D. C., for appellee.

Before GARRETT, Chief Judge, and HATFIELD, JACKSON, O'CONNELL, and JOHNSON, Judges.

GARRETT, Chief Judge.

This is an appeal from the decision of the Board of Interference Examiners of the United States Patent Office awarding priority to the party Roth in an interference proceeding involving a single count which relates to albums for holding phonograph record disks. The count reads:

"In an album for record discs centrally apertured to receive the centering post of the turntable of a phonograph, a back cover, a front cover, a retaining post issuing from said back cover and adapted to be received in the central aperture of each of the several record discs of a stack and keep them disposed relative to each other

with their central aperture in register, and latch means on the front cover for cooperation with said retaining post releasably to latch the covers together and to hold such record discs strung on said retaining post between said covers."

In view of the issues involved no extraneous explanation or analysis of the count is necessary.

Roth is the senior party, his application having been filed November 11, 1942. That of Adam and Adam, hereinafter usually referred to as appellants, was filed some ten months later on September 15, 1943.

Both the respective parties took testimony but the board did not consider the evidence presented on behalf of Roth, because it found the evidence on behalf of appellants insufficient to establish a reduction of the invention to practice prior to the filing date of Roth and insufficient also to establish diligence on the part of appellants during the critical period.

The interference was declared February 3, 1944.

It appears that the son, Folger Adam, Jr., was in the military service and received wounds, during the engagement at the Marshall Islands, about February 12, 1944 from which he died on February 23, 1944, prior to the filing of preliminary statement. The statement, apparently filed March 13, 1944, was made by the father on behalf of himself and son. It alleged conception, the making of a drawing and disclosure to others on or about September 1, 1941, and the completion and successful use of a full sized device (which, it was claimed, "constituted a complete reduction to practice") during March 1942. Diligence was alleged also "at all times since the original conception."

The witnesses called and examined on behalf of appellants were the senior Mr. Adam; his wife, Mrs. Hazel C. Adam; a daughter, Mrs. Marjorie A. Fisher, who was living in the home of her parents during 1941 and up to July 1, 1942; and Mr. Herbert P. Stutz, who was in the employ of Folger Adam Company, a manufacturer of prison locks, as machinist foreman, in 1941 and 1942 and at the time of

testifying in November 1945. He then testified that he was 26 years old; that he had been connected with the Adam Company for 15 years, and that "every once in a while" Mr. Adam had him "make different things for him"—that is, special things other than prison locks. The record of appellants contains also certain exhibits which were introduced in evidence. Exhibit 2 is stated to be the album completed in March 1942.

As we understand the board's decision, it awarded appellants conception as early as in September 1941, the time claimed in the preliminary statement, and also "in the early part of 1942." It stated:

"The testimony of Adam, Sr., as corroborated by Stutz is deemed to establish that an album was constructed according to the drawing, Adam Ex. 1 in September of 1941 and that another album, Adam Exhibit 2 was constructed in the early part of 1942."

The board held, however, that there was no reduction to practice of the appellants' device prior to the filing date of Roth, saying:

"It appears from the testimony that the first album underwent a number of changes because of difficulty in gluing the stud washer to the inside face of the album cover and eventually it was discarded and Exhibit 2 built. Thus, even though it was alleged to have been used to carry records, it is not believed that its practicability was sufficiently demonstrated to amount to a reduction to practice."

The board quoted literally all the pertinent testimony of Mr. Stutz, Mrs. Adams, and Mrs. Fisher, who were the only persons called as corroborating witnesses on the matter of the use of the albums—i. e., reduction to practice. We shall follow the board's example in this respect to some extent, but before quoting their testimony we reproduce such of the testimony of Mr. Adam, Sr. as is pertinent upon the question of actual use of the albums for holding records:

"Q. Then what did you do, if anything, with this record album, exhibit number two, after you had put the fixture in the front cover, as you have just explained?

A. We took the sample in to my patent attorney, Mr. Thomas A. Banning, in Chicago, and instructed him to apply for a patent.

"Q. No; but I mean, after you had made up the sample, did you ever make any use of it in your home, prior to that time? A. Yes, sir, we tested it, to see that it was a practical method of handling records; protecting them.

"Q. When did you do that? A. As soon as it was completed.

"Q. That would be about when? A. That would be in March, 1942.

"Q. Did you set any records on that stud and close up the album on it? A. Oh, yes, we had done that on the first sample we built, in September, 1941.

"Q. What was the result of the test that you made on this exhibit number two, in March of 1942? A. It was perfectly satisfactory. The only point that my son and I disagreed on and argued about was that of the thread, and the amount of rotation necessary on the wing nut to effect the engagement.

"Q. What do you mean by disagreement or argument about this matter? A. Well, I felt that the engagement between the stud and the nut should be made with only a partial turn of the wing nut. My son thought it was unimportant how many times you turned it.

"Q. So that was simply a matter of degree of rotation, was it not? A. That is exactly true.

"Q. Did you use this particular record album, exhibit number two, more than once to hold records as you have just explained? A. Yes, sir, we had records in it continually. In fact, when I delivered it to our patent attorney, it had two or three records in it. Perhaps he knows what became of them.

"Mr. Banning [counsel for appellants]: Objection. I will say this: They were not symphonies."

Elsewhere the witness testified as to loading the album made in September 1941 with records, but in view of the fact that that album was discarded and cannot, under the facts of this case, be considered upon the matter of reduction to practice that testimony need not be reproduced here. It might be of importance upon the question of conception if that were in question, but in the brief for Roth it is conceded, "for the purpose of this appeal," that "the invention embodied in the counts was conceived by Folger Adam Sr. and his son, Folger Adam Jr., about September 1, 1941." This, we may state, is prior to any date which could be awarded Roth for conception upon the record as it stands, Roth's earliest claim, in his preliminary statement, of the beginning of any activity being in October 1941.

If the testimony of Mr. Adam, Sr. upon the matter of using the album, exhibit number 2, were properly corroborated, even though it is somewhat meager of itself, it would seem that appellants should prevail, but unfortunately for them no such corroboration is found in the record.

The witness Stutz was able to corroborate him upon certain phases of the matter but the entire testimony of this witness relating to the use of the album for holding records is embraced in the following:

"Q. Did you ever see them [referring to the parts which he had made in conformity with a drawing produced by Mr. Adam, Sr.] being used with records on them after they were assembled into the album? A. I saw this once, I think, afterwards."

Witness indicates Adam exhibit number two.

"Q. Did you ever see any records in this album, exhibit number two? A. I don't recall any records being in the album."

The following is from the testimony of Mrs. Adam:

"Q. A few minutes ago you referred to this album which is lying on the desk, marked Adam exhibit two. When is the first time that you recall having seen that, or anything similar to that? A. I think there was one before that that they were working on.

"Q. Did you see that? A. I am quite sure that I did. They worked on it, and probably worked it to pieces. I think they had to try two or three.

"Q. Do you remember about when it was that you saw that first one? A. I would say it was in the spring of 1941.

"Q. The spring of 1941. Well, anyway, was it before Folger Adam, Junior, went back to college in the fall of 1941? A. Yes, it was.

"Q. Have you ever seen this exhibit number two, do you remember, before coming into this room today? A. Yes, sir.

"Q. When did you see it? A. Well, when they were working on it. I think that was in 1941.

"Q. Where was it that you saw the exhibit number two? A. At home. That is the only place I have ever seen it; at 310 Sherman Street.

"Q. Did you notice at that time how it was built, or used, or worked? A. No, I did not.

"Q. You did not examine the details? A. No, I did not.

"Q. But you do remember that it looked like the exhibit which is on the table here? A. Yes, sir.

"Q. And do you remember whether or not you ever heard them pass any comments as to the workability of it or whether it would work satisfactorily, or could be made to work satisfactorily, or anything of that sort? A. No. No, I do not."

The testimony of the daughter, Mrs. Fisher, like that of her mother, indicates that she had no familiarity with mechanical matters, and, as stated, in substance, by the board was not able to explain the structure in a manner which showed that it was within the requirements of the count. We think it unnecessary to quote her testimony literally.

The inability of the witness to explain the structure would not be of any particular importance before us because of concessions made on the part of the party Roth, but the inability, or at least the failure, of any witness to corroborate Mr. Adam, Sr. upon the matter of use of exhibit 2 for holding records is fatal to appellants' case so far as actual reduction to practice is concerned.

No rule of patent law is more firmly established than that which holds that an applicant, however truthful he may be deemed to be by the tribunals of the Patent Office and by the courts, cannot establish reduction to practice by his testimony alone. As expressed by the board in its decision here appealed from:

" * * * an applicant must be fully corroborated as to the successful testing of a device embodying all of the limitations of the count or counts in order to establish a reduction to practice * * *. Obviously witnesses who do not know the construction of the device being tested as in the present case cannot supply the essential corroboration. (Castricone v. McCabe, 111 F.2d 653, 27 C.C.P.A., Patents, 1198, 520 O.G. 269, 1940 C.D. 536; George v. Karsel, 111 F.2d 148, 27 C.C.P.A., Patents, 1063, 518 O.G. 776, 1940 C.D. 401, Muessner et al. v. Hosclike et al. [sic Miessner v. Hoschke], 76 U.S.App.D.C. 343, 131 F.2d 865, 545 O.G. 443, 1942 C.D. 103.)"

One of the contentions on behalf of appellants before us is that the involved invention is of such a simple nature that the mere construction of a device embodying it constitutes its completion and that tests are not needed to meet the requirement of reduction to practice.

We are unable to agree with this contention. The first device made by appellants, although conceded by appellee to have demonstrated conception of the idea, so failed to meet the requirements of successful use that it was abandoned. That of itself would indicate that the second device required full testing. It is somewhat rare to find a device or method or composition which meets the test of invention where no actual reduction to practice must be shown. We do not think the device here involved does so.

The question of diligence need not be dwelt upon, because it is perfectly clear that there was no activity by appellants during a time just prior to Roth's filing date, November 11, 1942, until their own filing date, September 15, 1943, which indicated the slightest diligence. The date

when the matter was placed in the hands of appellants' attorney for the preparation of an application is not shown. No excuse for the delay in filing is offered other than statements by Mr. Adam, Sr. that he was engaged in war work.

The decision of the Board of Interference Examiners is affirmed.

Affirmed.