37 C.C.P.A.(Patents)

## SCHARMANN v. KASSEL.

### Patent Appeal No. 5646.

United States Court of Customs
and Patent Appeals.

Feb. 2, 1950.

J. Cashman and L. F. Marx, Elizabeth B, N. J., (W. F. Weigester, Washington, D. C. of counsel), for appellant.

Charles M. Thomas, Washington, D. C. (M. P. Venema, Chicago, Ill., of counsel), for appellee.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, and JOHNSON, Judges.

O'CONNELL, Judge.

This is an appeal from the decision of the Board of Interference Examiners of the United States Patent Office awarding priority to appellee upon the single count in issue, which reads as follows: "The method of regenerating spent catalyst fouled with carbonaceous contaminants in a system wherein the spent catalyst moves continuously through a regeneration zone which comprises, admixing cool regenerated catalyst with the spent catalyst and treating the mixture with a gas containing free oxygen under conditions such as to cause the combustion of the carbonaceous contaminants."

Two applications are involved: appellee's application, No. 330,951, filed April 22, 1940, and appellant's application, No. 340,712, filed June 15, 1940. Appellant's application was assigned to the Standard Oil Development Company and that of appellee to the Universal Oil Products Company.

Both parties submitted stipulated testimony in affidavit form together with other documentary evidence. Accordingly, the record consists of numerous affidavits of testimony-in-chief, rebuttal affidavits, and documentary exhibits. Both parties also filed briefs and appeared at final hearing.

As the junior party, it was incumbent upon appellant to establish priority by a preponderance of the evidence. He alleged in his preliminary statement that an illustrative drawing, together with the first written description of his invention and its disclosure to others, was made by him on August 22, 1938; that on September 6, 1938, he signed a patent memorandum containing a description of the invention, and on or about that date began actively exercising reasonable diligence in adapting or perfecting the invention; and that on August 4, 1940, the invention was reduced to practice "on a plant scale."

Appellee in his preliminary statement alleged conception, the first written description and explanation of his invention to others, the beginning of diligence, all on February 15, 1940, and that he did not reduce the invention to practice prior to his filing date of April 22, 1940.

The record discloses that the catalyst which commonly serves to promote the cracking of hydrocarbon oils and converting them into motor fuels of a high octane value becomes fouled in the cracking reaction by carbonaceous contaminants which cause the catalyst to lose its activity. The invention in issue relates to the regeneration of the spent catalyst so that it may be used again for the cracking or conversion of oil.

Appellee concedes in his brief that his application discloses two methods of regenerating fouled catalyst wherein reactivation is accomplished in either a batch or a continuous process. The former is old; the latter is new and alleged to be embodied in the invention of the count.

The Board of Interference Examiners found as a matter of fact that appellee's proofs established conception by him as early as May of 1938, as alleged in motion papers upon which appellee sought to amend his original preliminary statement and to add proposed counts.

The examiner after quoting such counts denied the motion in question on the ground, among other things, that the proposed counts were unpatentable since they omitted the essential limitation to a continuous process defined by the count in issue, and were so broad in terms that they "read on batch operations." According to the record, such an operation added "make up" catalyst, was performed in a fixed or stationary bed, was old in the art, and was denominated as a batch process.

The parties in their briefs have discussed appellee's motion to amend his preliminary statement. That motion was denied by the Board of Interference Examiners. Therefore it is not before us and need not be discussed.

Appellee's evidence consists of his own affidavit, the affidavits containing the corroborating testimony of Day and Thomas, and six documentary exhibits, numbered 1-6. The evidence is relied upon by appellee solely to establish conception as early as February 15, 1940, as asserted in his original preliminary statement, and not to establish his conception as of May 1938, as found by the board. The latter date was not awarded by the board for the purpose of the present interference due to an alleged mistake of law by appellee, which under the circumstances now disclosed by the record needs no further discussion.

Appellee Kassel and his two corroborating witnesses Day and Thomas are highly skilled in the art. For a number of years they were identified with appellee's assignee, Universal Oil Products Company, at Riverside, Illinois. From January 16, 1938, to July 16, 1945, Day was manager of the Research and Development Department of that company and by training and experience was well versed in the regeneration of catalysts. Appellee was Day's technical assistant and at that time was a chemist experienced in catalysts. Thomas in the same period was a member of the research staff of Universal and was engaged in research on the development of new catalysts and processes. He had numerous discussions with appellee relating to new catalytic processes, particularly catalytic cracking processes. Day and Thomas at the time their testimony was taken were no longer connected with Universal.

Appellee testified that as a result of his activities in experimental work involving the use of powdered catalyst for effecting catalytic reactions of hydrocarbon gases and vapors, he conceived the method defined by the count prior to May 5, 1938, and on or about that date fully and clearly disclosed the same to Dr. Day, together with the apparatus to be utilized in performing the method. On May 6, 1938, according to appellee's testimony, appellee recited his disclosure to Thomas.

In making the disclosure to both Day and Thomas, appellee testified he used his dated contemporary documentary exhibits of record to indicate the apparatus and the manner in which the process of the count was to be carried out in such apparatus. Those exhibits in themselves do not contain a complete and positive disclosure of the invention of the count nor establish the precise date of appellee's conception. They do, however, supplement and corroborate the oral testimony of appellee and the witnesses for appellee with respect to the substance of the invention and the date of its disclosure.

The stipulated testimony of appellee is clear and definite and in complete accord not only with the disclosure of his application but also with the testimony of the corroborating witnesses Day and Thomas. The record discloses, however, that appellee's proof of conception is to be found more readily in the testimony of his corroborating witnesses rather than in his own.

Day with reference to the method of the count stated in part:

"Prior to May 5, 1938, Dr. Kassel also disclosed to me a method or process for the regeneration of the spent catalyst after the completion of a processing period and for the purpose of reactivating such catalyst. He told me at the aforesaid time that the same apparatus as I have above described for effecting the processing of the hydrocarbon reactants was also to be employed for regenerating the spent catalyst and that in such apparatus alternate periods of proc-

essing and regeneration of the spent catalyst were to occur.

"At the indicated time Dr. Kassel told me that during the regenerating period of the apparatus the spent catalyst from the separator was to be admitted to a stream of air or other oxygen-containing gas and the mixture passed through a reacting or regenerating zone under conditions serving to burn the carbon carried by the catalyst, the regenerated catalyst to be delivered from the reacting or regenerating zone to the settling chamber where the gases would be removed and the regenerated catalyst powder commingled with the spent catalyst therein. Prior to May 5, 1938, Dr. Kassel stated to me that in this regeneration period a mixture of the regenerated and spent catalyst would be delivered to the reaction or regenerating zone to travel in suspension therein through such zone where the regeneration of the spent catalyst would occur and that this period was to continue until the entire charge of spent catalyst in the separator had been regenerated."

Thomas having discussed appellee's disclosure with him in detail as being substantially the same as hereinbefore described by the witness Day, stated in part with reference to appellee's disclosure of the apparatus to be employed by him in carrying out the method of the count.

"On May 6, 1938 Dr. Kassel further informed me that he planned to place a cooling coil in the upper portion of the separating chamber which would be used for preheating the charge during the processing period and the air or oxygen-containing gases during the regenerating period by indirect heat exchange with a suspension of catalyst in hot gases or vapors, which suspension contacted the cooling coil prior to the exit of the gases or vapors from the separating chamber. He explained to me that cooling in the top of the separating chamber would reduce the linear velocity of the gases or vapors and facilitate settling of the catalyst in the separating chamber. The catalyst particles cooled by indirect heat exchange with the air or oxygen-containing gases during regeneration would thereafter settle in the chamber and admix with the spent catalyst being discharged into the flowing stream of air or oxygen-containing gases entering the regenerating zone. As the result of this admixing of the cooled regenerated catalyst with the spent catalyst entering the regenerating zone, the average catalyst temperature attained during the regeneration would be substantially lower than would have been attained in the absence of the cooled regenerated catalyst in the mixture entering the regeneration zone.

"I distinctly recall the disclosures made to me as above recited and I can recall that Dr. Kassel on May 6, 1938 disclosed to me sketches of the design of the apparatus I have previously described."

Day and Thomas were each subjected to full and critical cross-examination as disclosed by the stipulated cross-interrogatories of record propounded by appellant and the verified answers submitted thereto by the respective witnesses. The board has held, despite the severe attack upon the credibility of the witnesses and the criticism of inoperativeness by appellant, that the testimony of both those witnesses, when considered in connection with the documentary exhibits, has not been shaken or weakened but, on the contrary, stands as positive and forthright corroboration of the disclosure by appellee of his conception of the invention of the count in May of 1938.

After discussing the evidence of the respective parties, the board held that appellee was last to conceive but first to constructively reduce the invention to practice. The board also held that appellant had failed to establish reasonable diligence with respect to his reduction to practice from a date just prior to appellee's entry into the field on February 15, 1940, until the filing of appellant's application on June 15, 1940, the date of his constructive reduction to practice. On that basis, the board further held that appellee Kassel was entitled to the award of priority.

Appellant contends the Board of Interference Examiners misconstrued the count by reason of the failure to give due weight to the limitation of the count which requires that the spent catalyst shall move continuously through a regeneration zone. Ap-

pellant alleges that as a consequence of such misconstruction, the board erroneously awarded appellee a date of conception on proofs which do not support the count, in that the spent catalyst in the method disclosed by appellee does not move continuously through a regeneration zone but rather moves discontinuously or during alternating periods in the same apparatus.

The count did not originate in the application of either party but was drafted by the Primary Examiner to cover the patentable invention disclosed in the application of each of the respective parties and common to both of them.

The import of appellant's argument on the point in question is that the proofs submitted by appellee do not support the count because such proofs relate solely to an operation performed batchwise in which a single apparatus is employed for alternately processing the catalyst whereby the apparatus upon the completion of a cracking cycle is thereafter operated to move the spent catalyst continuously through the same zone for the regeneration of the spent catalyst. That type of operation, appellant contends, is properly called an alternating or intermittent process and is not the continuous process the examiner had in mind when he framed the count in issue.

The regeneration or reactivation of the fouled catalyst is accomplished in the method of the count by burning the carbonaceous matter from the spent catalyst with a gas containing free oxygen in a system wherein the contaminated catalyst moves continuously through a regeneration zone. During that operation, cool regenerated catalyst is admixed with the spent catalyst and the mixture is treated with a gas containing free oxygen to cause combustion of the carbonaceous deposits attached to the fouled catalyst.

The continuous regenerating process of the count is described in appellee's application as a procedure in which there is alternate continuous processing or catalytic cracking, and the subsequent continuous regeneration of the fouled or spent catalyst. Specifically, according to the language of appellee's application, his described procedure in catalytic processes embodies "alternately operated reaction zones * * * through which the hydrocarbon reactants flow during the processing cycle" followed by "the reactivation cycle."

The latter cycle is described in appellee's specification so as to clearly teach the continuous reactivation of the spent catalyst throughout the regeneration cycle in accordance with the limitations of the count. Moreover, an original claim involving a disclosure in appellee's application called for the reactivation of the spent catalyst upon which carbonaceous materials have been deposited "during a prior processing cycle." That disclosure was before the examiner when he drafted the issue defined by the count.

No specific apparatus for carrying out the invention is defined by the count, and any apparatus wherein the spent catalyst obtained from a source moves continuously through the regenerating zone for reactivation in the oxygen stream satisfies the requirement of the count. In the system or apparatus contemplated by appellant, both the cracking process and the method for the regeneration of the spent catalyst proceed simultaneously in two different elements of the apparatus. That employed by appellee provides for alternate cracking and regeneration operations in one and the same zone of the apparatus.

The invention of the count is to be distinguished, however, not only from a process for cracking or converting hydrocarbon oils in the production of motor fuel, of which the present invention is wholly separate and independent, but also from an invention consisting of a combination of elements.

Appellant in presenting the same argument before the board that he presents here contended that the invention defined by the court required that the method be carried out in a system or apparatus in some part of which the catalyst becomes fouled with carbonaceous contaminants, and in another part of which the spent catalyst moves continuously through a regeneration zone. That contention was appraised and described by the board as "too labored to de-

serve extended discussion." In rejecting appellant's contention, the board, among other things, correctly held: " * * * The only system referred to in the count is the regeneration system. The common patentable invention is not concerned with where, how, and when the catalyst becomes fouled and there is nothing by word or implication in the count expressing such concern. On this score the count is clear and unambiguous; the regeneration of fouled catalyst must be continuous but the catalyst may be fouled in any sort of system. * * *"

■ In view of the state of the record, including the fact that the depositions for appellee have been introduced by stipulation in the form of affidavits, physical exhibits, cross-interrogatories, and verified answers thereto, we find no reason to disagree with the conclusion of the board relative to the date of appellee's conception of the invention of the count as of February 15, 1940. See Draeger et al. v. Bradley, 156 F.2d 64, 33 C.C.P.A., Patents, 1130.

■ Appellant's evidence established his prior conception of the invention of the count as of September 6, 1938. Where one is first to conceive but last to reduce to practice, he has the burden as first conceiver to affirmatively establish continuing and reasonable diligence, or reasonable excuse for failure to act, in reducing to practice from a date immediately prior to the time the subsequent inventor entered the field until reduction to practice by himself as the first conceiver. Hull v. Davenport, 90 F.2d 103, 24 C.C.P.A., Patents, 1194. Where the critical period is but a short one, the same rule of law prevails. Wilson et al. v. Sherts et al, 81 F.2d 755, 23 C.C.P.A., Patents, 914. Therefore, in order to prevail, appellant must show reasonable diligence or reasonable excuse for failure to act from a time just before the date of February 15, 1940, when appellee entered the field, to appellant's own filing date of June 15, 1940.

During the earlier part of the described period ending on May 20, 1940, and from December of 1939, appellant was preoccupied with an assignment of duty by his employer, which related not to the invention of the count but to a different project considered by his company necessary to national defense. Appellant was then employed at the Bayway demonstration plant of the Standard Oil Company of New Jersey located at the town of Linden, wherein the offices of appellant's assignee and its attorney were also located. With reference thereto, appellant testified: " * * * that during the said period he visited the office in the Development Division only on very few occasions since his duties at the said Bayway Demonstration Hydroforming Plant necessitated that he be at the said plant in person eight hours per day, usually from about 8:15 A.M. until 4:45 P.M. and on call the remainder of the twenty-four hours each day for seven days a week, including holidays."

The activity on which appellant relies to establish diligence in the preparation and filing of his application embodies a letter by Paul O. Dunham, acting assistant to the manager of the Patent Division of the Standard Oil Development, written to Joseph Cashman, an attorney in the same division, on or about February 21, 1940, directing the latter to prepare an application based on a patent memorandum appellant had prepared on September 6, 1938, describing the invention of the count. On February 16, 1940, Cashman dictated an initial rough draft of a patent application for appellant, having had a conference with Dunham on February 15, 1940, "regarding patent memoranda on which patent applications were to be prepared."

■ That activity on February 16, 1940, directed toward the filing of an application, the board correctly held, came a day too late to constitute diligence just before appellee entered the field. Furthermore, the casual mention of appellant's patent memorandum made in the letter of Charles E. Hemminger, dated January 19, 1940, was written approximately a month before appellee entered the field and not immediately prior to the date of February 15, 1940. Hence it is not relevant on the question of appellant's diligence. See Ireland v. Smith, 97 F.2d 95, 25 C.C.P.A., Patents, 1258; Watson v. Thomas, 23 App.D.C. 65.

Cashman's activity in preparing appellant's application for a patent was noted in Cashman's diary by his stenographic assistant who recorded an entry that on February 20, 1940, Cashman had dictated claims and revised appellant's patent application. The succeeding activities recorded in the diary are for March 26, 1940, to the effect that on said date Cashman "again studied" appellant's application; on April 1, 1940, that he again revised appellant's application; on April 12, 1940, that he again revised said application; on May 8, 1940, he again revised the application; and on May 28, 1940, he dictated a new or second rough draft of appellant's application, and revised the same on May 29, 1940.

Gaps in the activity of preparing appellant's application, some of which were weeks apart, are not adequately explained. In the meantime, the original rough draft of February 15, 1940, was lost and not later produced. The courts have held that unexplained delays of the attorney for the inventor, when they amount to lack of diligence, are attributable to the inventor. Brown v. Barton, 102 F.2d 193, 26 C.C.P.A., Patents, 889.

The board correctly noted, moreover, that the present record creates a doubt that during much of the time hereinbefore described, the application being drafted by Cashman did not incorporate the precise invention of the count.

The board in finally rejecting appellant's contention on the question of reasonable diligence by appellant made the following statement: " * * * There is a measure of excuse offered that Scharmann's preoccupation with national defense work prevented consultation with Cashman but the excuse does not stand up in the light of the fact in the period in question they both worked in Linden, New Jersey, that Scharmann did visit the office of the Development Division on occasion and that it was not actually a war period. It is our opinion that the activity directed toward filing as disclosed by the evidence does not show reasonable diligence either just before Kassel entered the field or during the critical period."

A party first to conceive who voluntarily lays aside his inventive concept cannot defeat another party who enters the field and reduces the same invention to practice while the one first to conceive was engrossed in the pursuit of other projects. Wilson v. Goldmark, 172 F.2d 575, 36 C.C. P.A., Patents, 849. That doctrine is directly applicable to the case at bar.

There is no doubt that in a proper case war activities may be sufficient as an excuse for the delay in filing an application for a patent by one who was first to conceive an invention. On the other hand, lack of diligence in such a situation is not excused by the mere assertion that the applicant was engaged in war work. Adam et al. v. Roth, 173 F.2d 259, 36 C.C.P.A., Patents, 875; Ross v. Burke, 57 App.D.C. 243, 19 F.2d 717.

Appellant was not a member of the armed services during the critical period. So far as the record discloses, his freedom to do what he wanted to do was in nowise curtailed. Appellant and his attorney were then employed in the same town by the same employer. Appellant visited the offices of the development division of the company on a few occasions but made no effort to consult Cashman, who apparently was located in the same building, or to inquire as to the status of his application during the critical period.

Cashman was a busy lawyer, but it is not affirmatively established that he exerted the proper effort by way of consultation or contact with his client during the latter's working hours, or his available free hours. In other words, it seems that an application could have been prepared, had appellant and his attorney exercised reasonable diligence, notwithstanding the alleged engrossing national defense work in which appellant was engaged.

In view of our conclusion that there is no manifest error in the decision of the board, it is deemed unnecessary to discuss

other points raised by counsel for the respective parties.

The decision of the Board of Interference Examiners, for the reasons hereinbefore stated, is affirmed.

Affirmed.

By reason of illness, HATFIELD, Judge, was not present at the argument of this case and did not participate in the decision.