SCHALL, Circuit Judge,
concurring in part and dissenting in part.
I am pleased to join Parts A and C of the court’s opinion. I respectfully dissent, however, from Part B. For the reasons set forth below, I believe the Patent Trial and Appeal Board (“Board”) applied the correct legal standard in finding that Perfect Surgical Techniques, Inc. (“PST”) failed to establish that Dr. Camran Nezhat, the inventor named on U.S. Patent No. 6,030,384 (“the ’384 patent”), exercised reasonably continuous diligence during the critical period. I also believe the Board’s finding on diligence is supported by substantial evidence.
I.
A.
The events leading to this appeal are not in dispute; In March 1997, Dr. Nezhat retained attorney James Heslin to prepare a patent application directed to bipolar forceps for electrosurgery. On or about January 28,1998, Mr. Heslin sent an initial draft of the application to Dr. Nezhat for his review. On March 2, 1998, Dr. Nezhat returned comments on the initial draft to Mr. Heslin. Mr. Heslin reviewed the comments two days later and asked Dr. Ne-zhat for further explanation. On March 12, Mr. Heslin sent Dr. Nezhat questions concerning the draft application. Mr. Heslin and Dr. Nezhat then conferred on March 16. After revising the application on April 7, Mr. Heslin sent a revised draft to Dr. Nezhat on April 13. Thereafter, on May 1, 1998, Mr. Heslin filed the application at the U.S. Patent & Trademark Office, constructively reducing the invention to practice.
B.
Olympus America, Inc. and Olympus Medical Systems Corporation (collectively, *1014 “Olympus”) filed a petition for inter partes review of certain claims of the ’384 patent. J.A. 2. In its petition, Olympus relied on Japanese Unexamined Patent Application No. H10-33551 A (“JP ’551”), which published on February 10, 1998. Id. 8, 13. During the IPR, PST sought to antedate JP ’551 to disqualify it as prior art. Id. 14-15. Specifically, PST asserted that Dr. Ne-zhat had conceived of the claimed invention before JP ’551’s publication date and that he had been diligent in constructively reducing his invention to practice. Id. To demonstrate Dr. Nezhat’s conception and diligence, PST submitted declarations and deposition testimony of Dr. Nezhat and Mr. Heslin, among others. Id. 18.
In assessing the evidence, the Board focused on Dr. Nezhat’s activities and asked whether he had demonstrated “continuous exercise of reasonable diligence” in reducing his invention to practice. Id. 16, 19, 22. In the Board’s view, the evidence revealed several unexplained “periods of inactivity” during the critical period. Id. 19-20. For example, the Board found Dr. Nezhat unable to identify any date on which he worked on the application from January 28, .1998, to March 1, 1998—the period during which the initial application was in his hands. The Board also found that Dr. Nezhat could not pinpoint any particular conflict during this. time preventing him from such work. Id. Thus, the Board explained, Dr. Nezhat could not adequately account for roughly the first three weeks of the critical period—i.e., from February 10, 1998, to March 1, 1998. Id. 20.
Significantly, the Board found only two dates in the entire critical period on which Dr. Nezhat took specific actions towards preparing his application. The first date was on March 2, 1998, when he submitted comments to Mr. Heslin on the initial draft. Id. The second date was on March 16, when he conferred with Mr. Heslin on questions about the application. Id. 20-21. The Board found no evidence, however, with respect to the nature of Dr. Nezhat’s comments on the initial draft or with respect to the conference. See id. As for Mr. Heslin’s testimony, the Board determined that it was not specific as to facts and dates and that it therefore could not establish Dr. Nezhat’s diligence during periods of inactivity during the critical period. Id. 21r-22.
Having considered the evidence, the Board found “at least” three unexplained intervals of time during the critical period with respect to which the evidence did not establish diligence on Dr. Nezhat’s part— namely, the intervals between February 10, 1998, and March 1, 1998 (“the First Gap”); March 12,1998, and March 15,1998 (“the Second Gap”); and April 13, 1998, and May 1,1998 (“the Third Gap”). See id. 19, 22. Consequently, the Board concluded that PST had offered insufficient evidence to establish Dr. Nezhat’s diligence' during the entire critical period.[1] Id. 22.
C.
In vacating the Board’s finding on diligence, the majority holds that the Board imposed an impermissibly demanding standard on PST. According to the majority, asking whether the inventor showed “continuous exercise of reasonable diligence” is “too exacting and in conflict with our precedent.” Ante, 1008. In the majority’s view, as I understand it, the proper standard is not whether an inventor shows “continuous exercise of reasonable diligence” dur *1015 ing the critical period, but rather, whether the inventor shows “reasonably continuous diligence”' during the critical period. Id. (emphases changed). Had the Board applied the proper standard, the majority reasons, it might have found sufficient diligence during the Second and Third Gaps based on record evidence and actions taken by Dr. Nezhat’s attorney. Id. 1017-19.
II.
After reviewing our cases and the record, I am not persuaded that the Board imposed too exacting a standard on PST. And, while I share the majority’s reservations concerning the Board’s handling of the Second and Third Gaps, in my view, the First Gap alone serves as substantial evidence for the Board’s conclusion on diligence.
A.
To establish' priority of an invention, a party must show either an earlier reduction to practice or an earlier conception followed by a diligent reduction to practice. Purdue Pharma L.P. v. Boehringer Ingelheim GMBH, 237 F.3d 1359, 1365 (Fed. Cir. 2001); see also In re Steed, 802 F.3d 1311, 1316 (Fed. Cir. 2015) (“When the issue of priority concerns the antedating of a reference, the applicant is required’ to demonstrate, with sufficient documentation, that the applicant was in possession of the later-claimed invention before the effective date of the reference.”); Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1576-78 (Fed. Cir. 1996) (explaining that a party attempting to'overcome anticipatory 'prior art has the burden to prove an earlier date of invention). "When a party relies on an earlier conception (PST’s circumstance), it must “connect[ ] the conception with [the inventor’s] reduction to practice by reasonable diligence on his part, so that they are substantially one continuous act.” Mahurkar, 79 F.3d at 1577 (quoting Christie v. Seybold, 55 F. 69, 76 (6th Cir. 1893)). The inventor must show diligence throughout the entire critical period, which runs from a date just before the prior art’s invention date to the inventor’s filing date. See Creative Compounds, LLC v. Starmark Labs., 651 F.3d 1303, 1312-13 (Fed. Cir. 2011); Mahurkar, 79 F.3d at 1578; 35 U.S.C. § 102(g) (2006) (“In determining priority of invention ... there shall be considered ... the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.”). Determining whether an inventor shows reasonable diligence is a “case specific inquiry.” Monsanto Co. v. Mycogen Plant Sci., Inc., 261 F.3d 1356, 1369 (Fed. Cir. 2001) (citing Jones v. Evans, 46 F.2d 197, 202 (C.C.P.A. 1931)).
Our cases have framed the diligence inquiry in a variety of ways. The majority is correct that some of our cases have asked whether an inventor showed “reasonably continuous” diligence throughout the critical period. See, e.g., Tyco Healthcare Grp. v. Ethicon Endo-Surgery, Inc., 774 F.3d 968, 975 (Fed. Cir. 2014) (quoting Brown v. Barbacid, 436 F.3d 1376, 1380 (Fed. Cir. 2006)) (“reasonably continuing activity”); Monsanto, 261 F.3d at 1370 (Fed. Cir. 2001) (“reasonably continuous [activity]”); Jepson v. Egly, 231 F.2d 947, 957 (C.C.P.A. 1956) (“reasonable continuous diligence”); BuRNs v. Curtis, 172 F.2d 588, 591 (C.C.P.A. 1949) (“reasonably continuous activity”).
Other cases, however, have couched the test in different terms. In Gould v. Schaw-low, our predecessor court asked whether an inventor’s testimony “support[s] a finding of that continuity of activity which constitutes reasonable diligence.” 363 F.2d 908, 916 (C.C.P.A. 1966) (emphases added). In Griffith v. Kanamaru, we inquired *1016 whether an inventor was “continuously or reasonably diligent” during the critical period. 816 F.2d 624, 629 (Fed. Cir. 1987) (internal quotations omitted); see also Scharmann v. Kassel, 179 F.2d 991, 996 (C.C.P.A. 1950) (“continuing and reasonable diligence”) (citing Hull v. Davenport, 90 F.2d 103 (C.C.P.A. 1937)). Still other cases have used different expressions for the test. See, e.g., Mahurkar, 79 F.3d at 1577 (defining “reasonable diligence” as “one continuous act”); Bey v. Kollonitsch, 806 F.2d 1024, 1030 (Fed. Cir. 1986) (requiring “reasonable diligence during the continuous ... critical period”). But perhaps most importantly for our purposes here, our predecessor court in In re McIntosh asked whether an applicant showed “continuous exercise of reasonable diligence.” 230 F.2d 615, 619 (C.C.P.A. 1956). This standard is the same one recited by the Board. Ante, 1008-09.
It seems to me that, when taken together, our cases suggest that the precise formulation of the diligence test is relatively unimportant because its ultimate prescription remains the same. What matters is that the party seeking priority “account for the entire period during which diligence is required.” Creative Compounds, 651 F.3d at 1312-13 (citing Gould, 363 F.2d at 919). This account must be “specific as to dates and facts” to establish diligence. Gould, 363 F.2d at 920. Gaps of inactivity during the critical period do not automatically defeat a finding of diligence so long as those gaps are adequately explained. Monsanto, 261 F.3d at 1369 (“[T]here need not necessarily be evidence of activity on every single day if a satisfactory explanation is evidenced.”); see also Brown v. Barton, 102 F.2d 193, 197 (C.C.P.A. 1939) (excusing inactivity “due to reasonable excuses or reasons for failure of action”); Scharmann, 179 F.2d at 997 (finding a lack of diligence when gaps in the inventor’s activity were “not adequately explained”). An inventor’s explanations for inactivity must be corroborated. See Barbacid, 436 F.3d at 1380 (citing In re Jolley, 308 F.3d 1317, 1328 (Fed. Cir. 2002)); Kendall v. Searles, 173 F.2d 986, 993 (C.C.P.A. 1949); see also Monsanto, 261 F.3d at 1369 (requiring a “satisfactory explanation” to be “evidenced”). We assess corroboration under a holistic “rule of reason,” Barbacid, 436 F.3d at 1380, but this standard is not so permissive that it “dis-penséis] with the requirements for some evidence of independent corroboration.” Coleman v. Dines, 754 F.2d 353, 360 (Fed. Cir. 1985). Thus, as I understand the law, establishing diligence requires that the inventor account for his or her activities during the entire critical period. Where there are stretches of inactivity, the inventor must provide a reasonable justification for those gaps with corroborating evidence.
Against this backdrop, I am not persuaded that the Board applied an inappropriate standard against PST. The Board cited the diligence test from McIntosh and asked whether Dr. Nezhat could account for “the entire critical period.” J.A. 16. The Board then identified periods of inactivity and assessed the reasonableness of the explanations provided, if any, for them. Id. 19-22. In doing so, the Board searched for evidence corroborating the offered justifications. Id. While this approach says little about the accuracy of the Board’s conclusions (addressed in Part II.B. below), I cannot find error in these contours of its methodology. Accordingly, I do not believe the Board applied an improper standard in finding a lack of diligence on the part of Dr. Nezhat.
PST contends that the Board erred by placing an inordinate focus on specific periods of inactivity rather than on the entire critical period “as a whole.” Appellant Opening Br. 31. I do not agree. As I read *1017 them, our cases turn on whether evidence supports a satisfactory explanation for periods of inactivity. Monsanto, 261 F.3d at 1369. Shorter gaps may be easier to explain than longer ones. See, e.g., Barbacid, 436 F.3d at 1380-83 (determining that six single-day gaps in a 31-day critical period did not defeat a showing of reasonable diligence); Jolley, 308 F.3d at 1327 (affirming the Board’s determination that “reasonable everyday problems” excused gaps in the inventive record); see also Monsanto, 261 F.3d at 1369. As the majority points out, however, even a brief gap may give rise to a requirement for some nominal justification or explanation for the period. See ante, 1009-10 (discussing In re Mulder, 716 F.2d 1642 (Fed. Cir. 1983)). Inventors may find longer periods of inactivity more difficult to defend. See, e.g., In re Meyer Mfg. Corp., 411 Fed.Appx. 316, 319-20 (Fed. Cir. 2010) (concluding that “an unexplained gap of just over two months” supported the Board’s finding of insufficient diligence); Gould, 363 F.2d at 919, 921 (holding that a lapse in activity of “nearly two months” defeated a claim of diligence); Morway v. Bondi, 203 F.2d 742, 749 (C.C.P.A 1953) (concluding that two separate “hiatus[es] of one and one-half months” did not constitute “reasonable diligence in reducing the invention'to practice during the critical period”). But even long gaps can be sustained if the explanations for them are sufficiently reasonable. See, e.g., Rey-Bellet v. Engelhardt, 493 F.2d 1380, 1389 (C.C.P.A. 1974) (finding that “a shortage of monkeys and a limited ability to house them” justified a three-month delay in testing); Reed v. ToRNqvist, 436 F.2d 501, 504-05 (C.C.P.A. 1971) (determining that four weeks of inactivity did not preclude a finding of diligence because it was excused by inventor’s vacation in Sweden and the unexpected illness of the inventor’s father). In each of these cases, the court focused on identified gaps and asked whether they were reasonable under the circumstances. I cannot fault the Board for taking a similar approach in PST’s case.
In my view, the Board’s approach was consistent with our law. In several places in its decision, the Board evaluated not just the existence of the identified gap periods, but also whether the record reasonably justified them. For example, the Board searched for evidence of Dr. Ne-zhat’s surgery schedule, potential teaching conflicts, the “nature of [the] comments” which took him over a month to prepare, any explanation offered by PST for the Third Gap, and other such evidence. E.g., J.A. 20-21. This kind of information, I think, speaks to the reasonableness of the gaps of inactivity. Indeed, the Board expressly sought this information to gauge “the reasonableness of any gaps in [Dr. Nezhat’s] activity and explanations for such periods of inactivity.” Id. 20.
In sum, I believe the Board’s approach of identifying gap periods and assessing their reasonableness in light of corroborating evidence was consistent with our precedent. Therefore, I believe the Board applied an appropriate standard in appraising Dr. Nezhat’s diligence.
B.
Turning now to the substance of the Board’s findings, the Board found three periods of inactivity purportedly attributable to Dr. Nezhat in its Final Written Decision: the First Gap (spanning the publication of JP ’551 to Dr. Nezhat’s submission of comments to Mr. Heslin), the Second Gap (spanning a weekend), and the Third Gap (spanning Mr. Heslin’s transmission of a revised draft to Dr. Nezhat to filing).
We review the Board’s factual findings on diligence for substantial evidence. Monsanto, 261 F.3d at 1369. Substantial evi *1018 dence justifies a finding if a reasonable mind might accept the evidence to support it. Consol Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). This standard involves an examination of the record as a whole, taking into account evidence supporting and detracting from an agency’s, finding. Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Substantial evidence does not require the Board’s finding to be the only one possible from the record so long as it is reasonable. “[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent [a] finding from being supported by substantial evidence.” In re Gartside, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (quoting Consolo v. Fed. Maritime Comm’n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)); see also Jolley, 308 F.3d at 1320 (“If the evidence in record will support several reasonable but contradictory conclusions, we will not find the Board’s decision unsupported by substantial evidence simply because the Board chose one conclusion over another plausible alternative.”).
1.
At the outset, I agree with the majority that the Board’s treatment of the Second and Third Gaps is troubling. As the majority observes, the Second Gap reflects a three-day period spanning a weekend. Ante, 1010-12. Immediately preceding this weekend, Dr. Nezhat and Mr. Heslin actively communicated about the invention. Id. And immediately afterward, they held a conference to discuss it. Id. Given the short duration of this period, its status as a weekend, and the inventor’s activities surrounding it, I share the majority’s position on the unreasonableness of the Board in basing its diligence finding on the Second Gap. Id.
I also agree with the majority in faulting the Board for failing to consider Mr. Hes-lin’s activities during the Third Gap. Id. 1010-11. An attorney’s diligence is imputable to the inventor. E.g., Bey, 806 F.2d at 1027. Mr. Heslin undertook actions during the Third Gap that could be attributed to Dr. Nezhat, such as preparing an information disclosure statement and finalizing the application. Ante, 1010-11. Had the Board investigated Mr. Heslin’s actions, it may have arrived at a different conclusion on Dr. Nezhat’s diligence during the Third Gap. Accordingly, I agree that it was error for the Board to disregard Mr. Heslin’s activities during the critical period.
2.
I part company with the majority, however, in regard to the First Gap. In my view, the First Gap alone constitutes substantial evidence for the Board’s ultimate finding on diligence, as, it establishes that PST did not meet its burden of “ac-eountfing] for the entire period during which diligence is required.” Creative Compounds, 651 F.3d at 1312-13 (emphasis added). PST does not try to justify this delay with corroborating evidence. And because the First Gap is a 19-day period during which Dr. Nezhat indisputably controlled the draft application, none of the Board’s errors noted above impact its findings on this gap.
PST does not contest the Board’s finding that there was an absence of activity during the period of the First Gap. PST in fact concedes “there was no evidence of ‘diligence’ during the periods of inactivity” identified by the Board. Appellant Reply Br. 13 (emphasis added). That concession, I think, is justified by the record. As I see it, the question here boils down to whether, after viewing the evidence, the Board was unreasonable in finding that an unexplained gap in activity lasting nearly three *1019 weeks was sufficient to show a lack of diligence. In my view, a reasonable mind might conclude that it was.
For example, in Rieser v. Williams, 255 F.2d 419, 424 (C.C.P.A. 1958), our predecessor court affirmed a finding of the Board of Patent Interferences (“BPI”) that an inventor failed to show diligence during a 13-day stretch of the critical period. We explained that, “even aside from the question of corroboration,” the testimony of the inventor did “not show that he was doing anything toward preparing or filing his application during a period of a month or more immediately preceding [another party’s] entry into the field.” Id. Similarly, in Gould, the court affirmed the BPI’s award of priority to a senior party (i,e., the party first reducing an invention to practice) because it concluded that the junior party had failed to establish diligence. 363 F.2d at 919, 921. According to the court, the junior party did not “account for the entire period during which diligence [was] required,” as his testimony did not explain a potential lapse in activity of nearly two months with specific “dates and facts.” Id. at 919-20. Other diligence cases from this court and its predecessor have involved unexplained gaps of similar lengths and reached the same conclusion. See, e.g., Meyer, 411 Fed.Appx. at 319-20 (affirming the Board’s finding that “an unexplained gap of just over two months” defeated diligence claim); Ireland v. Smith, 97 F.2d 95, 99-100 (C.C.P.A. 1938) (determining that an appellant failed to establish diligence because there was “no proof in the record” of activity during a 25-day stretch of the critical period); Morway, 203 F.2d at 749 (concluding that separate, unexplained gaps of “one and one-half months” did not constitute reasonable diligence).
I recognize that the First Gap of unexplained inactivity here—which is part of a larger period of inactivity extending from the end of January until March 1—is generally shorter than the gaps in the aforementioned eases. But see Rieser, 255 F.2d at 424 (requiring the inventor to show activity during an initial 13-day span of the critical period). Still, given that the First Gap and the periods of inactivity in those cases are roughly the same size, it seems to me that the Board’s conclusion that the First Gap amounted to an unreasonable break in activity is consistent with our cases. Compare, e.g., Rieser, 225 F.2d at 424 (determining that an unexplained 13-day period of inactivity defeated a diligence claim) with Barbacid, 436 F.3d at 1380-82 (determining that six single-day gaps in a 31-day critical period did not preclude a showing of diligence).
Notably, PST may have established diligence in this case had it provided a “satisfactory explanation” for Dr. Nezhat’s inactivity with corroborating evidence. Monsanto, 261 F.3d at 1369, Indeed, courts have confronted idle periods longer than the First Gap and found that they did not preclude a showing of diligence. See, e.g., Rey-Bellet, 493 F.2d at 1389 (three months); Tornqvist, 436 F.2d at 504-05 (four, weeks). But here, PST’s only excuse for Dr. Nezhat’s inactivity during the First Gap is that he had other “professional commitments” and needed time “for study of the application.” Appellant Opening Br, 33. Although an “excuse for inactivity” may include “reasonable everyday problems and limitations,” Griffith, 816 F.2d at 626-27, PST offered no evidence of such problems and limitations other than Dr, Nezhat’s uncorroborated testimony. The Board found, and PST does not dispute, that the record does not include evidence during the First Gap as to Dr. Nezhat’s activities at all, let alone evidence “specific as to facts and dates” explaining nearly three weeks of inactivity during the critical period. See Gould, 363 F.2d at 920. On this record, I think a *1020 reasonable mind might find PST’s explanation unsatisfactory.
PST also failed to produce any evidence corroborating its justification for the First Gap. Given Dr. Nezhat’s claims that he “performed approximately four to six surgeries per week” and “worked an average of 80 hours each week,” Appellant Opening Br. 7, one would have expected the record to show medical records or testimony from independent witnesses supporting these points. But PST provided none, and I do not see any indication that PST attempted to locate such evidence.[2] While I am sympathetic to PST’s predicament of unearthing evidence from 1998, as the junior party it ultimately bears the burden of proving diligence. E.g., Price v. Symsek, 988 F.2d 1187, 1190-91 (Fed. Cir. 1993); Scharmann, 179 F.2d at 996.
The Board also found that “[n]o evidence is presented as to the ñatee of [the] comments” Dr. Nezhat returned to Mr. Heslin on March 2. J.A. 20. As I see it, this omission is noteworthy because it leaves open several scenarios under which the Board could have reasonably concluded that Dr. Nezhat was not diligent. For example, after receiving the draft on or about January 28, Dr. Nezhat could have read it, prepared comments that day, and then sat on the comments for over a month before eventually sending them to Mr. Heslin. Alternatively, he could have set aside the application and waited until March 2 to review it and prepare comments. The record simply does not indicate what was done and when it was done.
Further, PST’s inability to substantiate the extent of Dr. Nezhat’s comments limited the Board’s ability to glean his diligence through inference. Had the record shown Dr. Nezhat making substantial remarks on the draft application, providing detailed questions to Mr. Heslin, or taking other such strides, the Board may have been able to discern Dr. Nezhat’s diligence during the First Gap. Without such evidence before it, however, I do not believe the Board can be faulted for not concluding that Dr. Nezhat was diligent during the period of the First Gap.[3]
I do not find any of PST’s arguments persuasive. PST is correct that the Board should have considered the actions of Mr. Heslin in evaluating his diligence, but these activities are irrelevant to the First Gap. During the period of the First Gap, *1021 the draft application was unquestionably in Dr. Nezhat’s hands and PST does not rely on Mr. Heslin’s actions for establishing diligence during that period.
PST also is correct that the “rule of reason” required the Board to evaluate all the pertinent evidence as a whole. Appellant Br. 21-22. But this rule does not dispense with the twin requirements that (1) the evidence must still reasonably justify gaps in the inventor’s activity and (2) the justification must be corroborated with independent evidence. By shifting its focus to the entire critical period generally, rather than pockets of inactivity in particular, PST overlooks that it still must provide an evidenced, satisfactory explanation for the First Gap. Scharmann, 179 F.2d at 996-97. PST’s briefing does not include a detailed explanation for the First Gap, and its vague allusion to Dr. Nezhat’s hectic schedule and “careful review” of the draft is uncorroborated with independent evidence.
To conclude, I believe substantial evidence supports the Board’s finding that Dr. Nezhat failed to demonstrate reasonable diligence during the entire critical period. I therefore respectfully dissent from the majority’s decision on this point. Accordingly, while I agree that we should vacate the Board’s decision and remand the case to the Board for further proceedings, I would limit the remand proceedings to determining whether, under the correct claim construction, the invention claimed in the ’384 patent is anticipated or rendered obvious in view of JP ’551.

. In light of its determination that PST failed to establish diligence as to the dates during which the application was in Dr. Nezhat's hands, the Board reasoned that it need not separately address Mr. Heslin’s diligence or the asserted conception date. Id. 18, 22,

. The majority is correct that corroboration “may be provided by sufficient independent circumstantial evidence." Ante, 1010 (quoting Jolley, 308 F.3d at 1328). Here, however, PST has not provided any such independent circumstantial evidence with respect Dr. Ne-zhat’s professional or academic commitments during the First Gap. Cf. Jolley, 308 F.3d at 1328 (relying on testimony from three independent witnesses to corroborate an inventor's diligence). At the same time, the majority’s discussion on this score relates to Dr. Nezhat’s activities around the Second Gap, not the First. Ante, 1009-10.

. In its discussion of the Second Gap, the majority points to a sentence in a March 12 letter from Mr. Heslin to Dr. Nezhat as potentially evincing Dr. Nezhat’s March 2 comments. Ante, 1011-12 (citing J.A. 927). This letter does not change my opinion for several reasons. First, I am unable to locate in the briefing (here or below) wheré PST relied on this letter as substantiating Dr. Nezhat's activities during the First Gap. Indeed, as noted, the majority discusses this letter in the context of the unreasonableness of the Board’s conclusion concerning the Second Gap. Id. Second, I am unable to conclude that this passing remark necessarily justifies a 19-day gap in the critical period. The record shows that Dr. Nezhat could not account for his activities during this time, provided no evidence corroborating his schedule or the submitted comments, and never contacted Mr. Heslin within this timeframe. On these facts, I cannot conclude that a reasonable mind would have arrived at a conclusion different from that of the Board.