26 C.C.P.A.(Patents)

## CHITTICK v. LYONS.
### SAME v. LYONS et al.
#### Nos. 4178, 4179.

Court of Customs and Patent Appeals.
June 26, 1939

Edward H. Lang, of Chicago, Ill. (Henry C. Parker, of Washington, D. C., of counsel), for appellant.

Edmund G. Borden, of New York City, for the party Lyons.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

These are companion interference cases originating in the United States Patent Office in both of which priority was awarded the party Lyons by the Examiner of Interferences whose decisions were affirmed by the Board of Appeals. From the decisions of the latter the party Chittick appealed to this court.

With respect to the joint applicants Lange and Mason, whose application was involved in interference No. 71,941, it was held by both tribunals of the Patent Office that the disclosure of the application did not support the counts and no appeal was taken here from that holding. At one time parties other than Chittick and Lyons were involved in interference No. 66,784, but these also were eliminated below and did not appeal. So, the contest here is solely between Chittick and Lyons.

The cases come before us on a single transcript of record. Both interferences are between the same applications and present the same question. Chittick is the senior party, his application, serial No. 575,953, having been filed November 18,

1931 and that of Lyons, serial No. 628,-683, August 13, 1932. Chittick took no testimony and relies on his filing date for both conception and reduction to practice. The preliminary statement of Lyons claimed conception and reduction to practice in August 1930. The Examiner of Interferences awarded him dates conforming to his claims. The board awarded him August 13, 1930 for conception but held that he was not entitled to any date earlier than January 23, 1931 (and this date was awarded him) for reduction to practice. As the junior party, Lyons had the burden of establishing priority by a preponderance of the evidence.

Further it may be said that notwithstanding the numerous questions which have been raised from time to time during the progress of the cases the primary issue brought to us is a narrow one, as is evidenced by the following taken from the brief on behalf of appellant:

· "Appellant raises only one real question before this Court, namely, do the acts performed by Lyons or on his behalf, between the dates of August, 1930 and January, 1931, inclusive, establish reduction to practice of the inventions defined by the interference counts.

"Although Chittick has heretofore attacked Lyons' proofs on the ground that they failed to show conception of the invention prior to the filing of his application and failed to show reduction to practice for several reasons, Chittick is here relying only on Lyons' failure to reduce to practice because he failed to *adequately test* the composition or products covered by the counts. If Your Honors find that Lyons did reduce to practice during the above mentioned period, Lyons should prevail and the decisions of the Patent Office tribunals should be affirmed. If Your Honors find that Lyons' tests do not meet the requirements for reduction to practice, the decisions of the Patent Office tribunals must be reversed and priority awarded to Chittick."

Upon this basis we consider the cases. Notwithstanding the close relationship between them, it is deemed to be in the interest of orderly procedure to separate them for decision, as was done by the tribunals of the Patent Office, and, because of the fact that the principal discussions by both those tribunals were stated in interference No. 71,941, the two counts of that case will be considered first.

Suit No. 4179—Interference No. 71,941.

The counts read:

"1. A lubricant composed mainly of a lubricating vehicle and a minor portion of unsaturated polymers extracted from cracked petroleum light distillates chemically combined with sulphur.

"2. A sulphur base blending stock consisting of unsaturated polymers obtained from the treatment of cracked petroleum light distillates chemically combined with sulphur."

The Examiner of Interferences explains the counts as follows: "The subject matter relates to a composition resulting from the reaction between a polymer and sulphur. The composition is then blended with a petroleum oil fraction to form a lubricant. Each of the counts specifies that the source of the polymer shall be a 'cracked petroleum light distillate.'"

To the foregoing it may be added that the parties were seeking a lubricant for hypoid gears, particularly for gears in the rear end of automobiles. The lubricant is often referred to in the record as an "extreme pressure lubricant," and sometimes as a "cutting oil." The party Lyons, however, contends that the counts themselves "are not restricted to any particular lubricating use, and certainly not to extreme pressure lubricants or cutting oils." There is nothing in the decisions below indicating that they were held to be so restricted or limited, but it is proper to say that the testimony of Mr. Lyons indicates that he was primarily seeking a high pressure lubricant, or cutting oil, in order to meet competition in this field.

During the period which is of importance here, the party Lyons was employed as a chemical engineer by a prominent oil company and was engaged in research work, his headquarters apparently being in New York City. In August 1930 he conceived the idea of sulphurizing unsaturated polymers which were stored in a plant at Okmulgee, Oklahoma, and visited that plant where he caused a small batch of material to be prepared in accordance with his formula. It is unnecessary to relate details concerning this in view of appellant's concession that Lyons is entitled to a conception date as of that period. However, in view of the holding of the Examiner of Interferences that Lyons was entitled to a date of that

period for reduction to practice also, with which holding the board disagreed, it is proper to say that we agree with the board upon that point. The only test, if it may be called a test, given the batch of material was to drop some of it upon a piece of glass—seemingly a watch crystal—and observe the reaction. The Examiner of Interferences evidently based his holding largely upon the fact that those who observed the reaction were skilled chemists and upon the belief that, as such, they, by mere observation, could determine whether the product would be efficacious in actual use as an "extreme pressure lubricant," or "cutting oil," for hypoid gears. It is our view that to follow a rule of this character might lead to grave injustices in the administration of the patent laws. We regard the case as being distinguishable from the well-known case of Corona Cord Tire Company v. Dovan Chemical Corporation, 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610, cited by the Examiner of Interferences and strongly relied upon by Lyons.

It was further held by the Examiner of Interferences that certain tests performed by the General Motors' research laboratory, at the instance of Lyons, in January 1931, constituted reduction to practice, and this holding was concurred in by the board, and since these tests were conducted prior to Chittick's filing date, Lyons was awarded priority. We are of opinion that the issue turns upon the efficacy or sufficiency of those tests. Commercial production of the material did not begin earlier than May 1932. Apparently there were no actual sales until the fall of 1932, and there is no evidence of actual use of the oil in automobiles prior to Chittick's filing date.

That laboratory tests may constitute reduction to practice, under some circumstances, is so well settled that citation of authorities upon that point is deemed unnecessary. Such tests, however, must simulate actual service conditions with sufficient clearness to render it reasonably certain that the subject matter will perform its intended function in actual service.

The record discloses that Mr. Lyons, or some one acting for him, made arrangements with General Motors Company through Mr. H. C. Mougey of that company to test samples of the product at Detroit, Michigan, on an extreme pressure testing machine which had been designed and developed in the General Motors' research laboratories to do that type of testing. The samples were shipped to Mr. Mougey, and by his direction were tested by Mr. J. E. Lounsbury, an employee of the General Motors' research division. Mr. Lounsbury prepared what are referred to as "curve sheets" which, as we understand it, disclosed by means of curves, the results of the tests. Blue print copies of these curve sheets were made and delivered to Mr. Mougey who in turn furnished Mr. Lyons with copies.

With respect to the tests and curves the pertinent testimony of Mr. Lounsbury on direct examination was that "The applied pressure pounds per square inch, was the load that was applied directly to the rubbing surface of the tested specimen, and the beam load in pounds was a reading taken from the scale which was attached to the dynamometer, which is in reality a reading of friction, or can be transferred into a reading of torque," and, in substance, that sample 6PS, as shown by a curve numbered 424, had "good load carrying capacity."

His testimony on cross-examination by counsel for Chittick was as follows:

"XQ20. Mr. Lounsbury, do you recall what the maximum friction load was, that you could show on your testing machine? A. I don't remember to what extent the scale could be read on the dynamometer. I am of the opinion that the extreme beam load that could be read on that scale, was five hundred pounds, but I am not sure of it.

"XQ21. What is your opinion of the curve marked 425, forming part of Exhibit 31, as to the seizing of the lubricant tested? A. This curve indicates that there are no signs of actual seizure occurring; in other words, it ran through the entire test without seizing, without causing seizure.

"XQ22. Now, refer to curve 426. How did you know that that seized? A. You mean how did I know it seized during the test?

"XQ23. I mean how does the curve show that it seized? A. Because actual seizure occurred between the test specimens, and the seizure was of such extent that it was necessary to stop the machine in order to prevent breakage.

"XQ24. Was there any criterion at that time, as to the amount of torque that

should show up for a given applied pressure? A. There was not.

"XQ25. Then all you did was record the actual torque and applied pressure, without anything further? A. Well, I recorded the actual beam load as shown on the scale, and the actual applied pressures.

"XQ26. But it was not your duty to comment on the suitability of the material? A. That is right, it was not my duty."

His testimony on redirect examination reads:

"RDQ27. Mr. Lounsbury, in referring to this machine, could you tell us how the load was applied, as the test proceeded? A. You mean how the applied pressure was applied?

"RDQ28. Yes. A. Yes. The load was applied at the end of the lever, which had a forty-to-one ratio, and twenty-five pound weights were placed on the end of this lever at ten second intervals; working through this forty-to-one ratio, each twenty-five pound weight would cause an actual one thousand pounds per square inch to be applied to the test specimen. The weights were added, as I said, at ten second intervals, which was done by means of a man applying the weight each time an electric alarm rang.

"RDQ29. Did you have a set time to stop applying weights? A. We stopped applying weights ten seconds after the twenty-fifth weight was applied.

"RDQ30. That means that any test was stopped after twenty-five thousand pounds had been applied? A. Providing the test specimens had not seized before that time.

"RDQ31. Well, when the specimens seized, the whole machine was stopped, that is my understanding of your previous testimony. A. That is right, the seizure would be so great that it would cause what appeared to be actual welding between the test specimens and would necessitate stopping the machine immediately."

It is uncertain whether Mr. Mougey witnessed the tests made by Mr. Lounsbury. He testified that he may have done so. His testimony, however, was based in part upon the blue prints of the curve sheets with which he had been supplied and other documents, all of which are in the record as exhibits, and upon his knowledge of the machine. In general, his testimony does not differ materially from that of Mr. Lounsbury respecting the results obtained but it is somewhat more detailed. Two samples appear to have been tested, one designated 6PS and the other 6SA, the former being the one of importance here. Concerning the tests of these Mr. Mougey said: "The curves show that under the operating conditions the friction became so great on sample 6SA, when a calculated load of eight thousand pounds per square inch was applied to the test sample, that seizure occurred. On sample 6PS, under the conditions of test, at 100 RPM, the friction remained sufficiently low during the entire test, to permit the application of the full load of the testing apparatus."

He further testified: "A lubricant that would carry the full load without seizure and without exceeding the capacity of the machine, was considered by us to be a lubricant in the extreme pressure field."

The serious question in our minds is whether the machine upon which the tests were made was shown to have been of a character which justifies a holding that the tests simulated actual service tests with sufficient closeness to constitute reduction to practice.

That the machine was not satisfactory to the General Motors Company is evidenced by the fact that its use was discontinued and it was disassembled. The following testimony of Mr. Mougey was given on cross-examination:

"XQ58. Do you know whether the testing machine on which the samples sent to you by Mr. Mears or Mr. Merley, whoever it happened to be, were tested, is still in use? A. It is not still in use, and the apparatus has been disassembled. Part of the apparatus is in use at the present time, and whether all of the equipment could be reassembled from our stock, I do not know.

"XQ59. Has that type of machine been supplanted by another type of testing machine for testing extreme pressure lubricants? A. There is no official method of testing extreme pressure lubricants at the present time.

"XQ60. Was the machine which you used to test the samples sent to you by the Cities Service Company, an official testing machine? A. We designed and built the machine in our own laboratory.

"XQ61. Was it recognized as an official testing machine? A. There is no official testing machine for testing extreme pressure lubricants, at the present time. The

Society of Automotive Engineers have a committee that are working on a machine called the SAE extreme pressure testing machine, but it is not the official recognized means of testing extreme pressure lubricants.

"XQ62. What is the recognized method of testing extreme pressure lubricants? A. There is no official laboratory method for testing extreme pressure lubricants.

"XQ63. Do I understand, then, from your answer, that the only satisfactory way to test extreme pressure lubricants is to give them an actual service test? A. *The only final test on any lubricant is performance in service.*

"XQ64. Isn't it true that an extreme pressure lubricant tested on the machine which you used to test the Cities Service samples, might test all right on your machine, but would not give satisfactory results in actual service? A. *The extreme pressure machine tests only load carrying ability, and does not test the other properties.*

"XQ65. Can you tell me what the Gleason test is, as referred to in Lyons' Exhibit 24? A. The Gleason test is a laboratory test made by the Gleason Company, in which lubricants are tested in a rear axle under certain conditions prescribed by the Gleason Company.

"XQ66. Why did you want to know whether the samples that were sent to you by Cities Service or Henry L. Doherty Company, were tested or approved by Gleason? A. The Packard Company have a great deal of faith in the Gleason test, and they use it as one of the means of testing extreme pressure lubricants. The Packard Company have from time to time, supplied us with some of the information on some of the tests made at Gleason's, to help in the work of developing extreme pressure lubricants.

"XQ67. Do you know whether the Gleason test simulated actual service conditions more closely than your machine did? A. *There is a difference of opinion on that matter.*

"XQ68. *Isn't it a fact that in certain instances, extreme pressure lubricants exhibited satisfactory load testing capacity in actual service, in hypoid gears, and did not exhibit satisfactory load capacity when tested on your machine?* A. *Yes, sir.*

"XQ69. *And isn't the reverse also true.* A. *Yes, sir."* (Italics ours.)

In view of the foregoing testimony, we feel constrained to disagree with the concurring holdings below that the January 1931 tests were satisfactory, or of a character which constituted reduction to practice of the lubricant involved. While there is correspondence in evidence that Mr. Lyons and those associated with him felt satisfied with the lubricant so far as its lubricating qualities were concerned (there being some dissatisfaction because of the odor of the mixture) it seems to us of some significance that there was a delay of a year and a half or more in commercializing the product, although the field was a competitive one, and the patent application was delayed for practically seventeen months after the tests. Mr. Lyons testified that at some time between January 1931 and early in March of that year experiments were made in an effort to improve the odor, and a letter written by him to Mr. S. R. Merley, of Empire Oil and Refining Company, of Okmulgee, Oklahoma, was introduced in evidence, in which the following was said:

"These samples have been examined and we believe that it is entirely possible to produce a good odor in this material by the addition of any one of the several materials which you used. I have taken up the matter with Borden and we have agreed to appropriate $1,000 for further work on this grease. However, before beginning the work, I would like to have an outline of what you would propose doing along this line. I have several ideas which I would like to have you consider in making up this outline—

"Inasmuch as we do not have a supply of polymers on hand sufficient to make any large quantity of this lubricant, I would suggest that we get five or ten gallons of current production of polymers made by Standard at Bayway, to determine whether or not satisfactory grease could be made from them.

"I also have in mind that we should fractionate these polymers and determine whether or not one or several of the fractions contribute most to the bad odor, and if so, they might possibly be eliminated from the material which we use to make the grease.

"I think that we should make up sulphur polymer mixtures containing varying amounts of sulphur, to determine whether or not we can produce a mixture which is entirely free of elemental sulphur. If

this is possible, we will want to test lubricants containing such mixtures to determine whether the combined sulphur or the free sulphur is the desirable constituent of the finished grease. No doubt, we will also have to determine the least possible percentage of sulphur that is necessary to produce a satisfactory lubricant."

The above indicates, of course, that there was concern relative to the odor, but it seems that, under a fair interpretation of the language, concern is also indicated respecting other properties of the lubricant.

All research work was stopped, according to the testimony of Mr. Lyons, in early March of 1931 and nothing more seems to have been done until after the filing date of the Chittick application.

It does not seem to us that the party Lyons has established reduction to practice by a preponderance of the evidence.

With respect to the contention on behalf of Lyons that the counts are not restricted or limited to an extreme pressure lubricant or cutting oil, it seems sufficient to say, conceding this to be true, that the record contains no evidence of any tests except tests relating to oil of that character, if the "watch crystal" experiment be disregarded, as we think it must be.

Before the Examiner of Interferences the party Lyons, after being placed under order to show cause why judgment upon the record should not be entered against him as between his application and the joint application of Lange et al., entered a motion to dissolve both as to Lange et al. and as to Chittick, alleging that neither of those applications disclosed the invention. The Examiner of Interferences pointed out that interference No. 71,941 was declared as the result of an interlocutory decision in interference No. 66,-784, in which Lyons had the opportunity of opposing the admission of the claims corresponding to the counts now under consideration, and dismissed the motion. The question of priority not being involved in that proceeding there was no appeal from that action. When the matter came on for final decision by the Examiner of Interferences, however, he held that Lyons having opposed the admission of the counts had the right to question Chittick's disclosure. He further held that Chittick's original disclosure was sufficient to support the counts, but, as has been said, awarded priority to Lyons. In his appeal to the board

the party Chittick alleged that the Examiner of Interferences erred in holding that Lyons had the right to attack his (Chittick's) disclosure. Inasmuch as the board awarded priority to Lyons upon the facts, it apparently did not deem it necessary to pass upon the question so raised.

Chittick in appealing to this court stated no reason of appeal involving this matter and there was no cross-appeal by the party Lyons, but the latter raises the question in his brief and the brief for Chittick discusses the merits of Lyons' contentions. Under the rule stated by this court in Rollie B. Fageol v. Gabriel Midboe, 56 F.2d 867, 19 C.C.P.A., Patents, 1117, the question is before us, and Lyons' contentions regarding it have been carefully considered.

It was held by the Examiner of Interferences that a prior patent, No. 1,337,523, issued to Leslie et al., April 20, 1920 —"shows that the production of polymers from cracked gasoline was old in the art at the time Chittick filed his application and it was therefore unnecessary for Chittick to describe a method for their production."

The Examiner of Interferences cited as authority the familiar case of Webster Loom Company v. Higgins, 105 U.S. 580, 26 L.Ed. 1177. The principle stated is settled law followed by numerous decisions of various courts rendered subsequent to that in the Webster Loom Co. case, supra.

Lyons does not challenge the correctness of the principle, but alleges, in substance, that Chittick's original disclosure was "vague, imperfect and incomplete"; that it did not, until amended, meet the requirements of R.S. § 4888, 35 U.S.C.A. § 33, as to definiteness of description; that it did not disclose a method of extracting polymers from oil fractions; that it disclosed a process for the formation of polymers rather than their extraction, and, seemingly, that the process is inoperative because it does not disclose any method for extracting polymers alleged to be present in cracked petroleum.

Much of the argument on behalf of Lyons is based upon statements made by the Primary Examiner in different office actions while the Chittick application was receiving ex parte consideration, and upon the fact that the Chittick application was amended (subsequent to Lyons' filing date) as a result of such actions.

824

In answer to these contentions Chittick cites a number of patents, other than that to Leslie et al., which were made a part of the record, and also refers to certain of the testimony taken on behalf of his adversary, Lyons, which is claimed to establish his contentions respecting what was known to those skilled in the art at the time of the filing of his (Chittick's) application.

■ The arguments on behalf of both parties of necessity involve matters quite technical in character. Whether they are more elaborate than those presented before the Examiner of Interferences, we are unable to determine, but it must be assumed that he, as an expert, considered all matters pertinent to this important point.

■ From our own examination of the record we do not feel justified in holding that the Examiner of Interferences committed error in sustaining the right of Chittick to make the counts in view of the known state of the art at the time of filing his application.

From the recitations already made, it is clear, we think, that Lyons did not show diligence during the critical period from just before Chittick's filing date of November 18, 1931, until his own filing date of August 13, 1932.

So, the decision of the board in interference No. 71,941 is reversed.

Suit No. 4178—Interference No. 66,784.

. This case involves a single count which reads: "1. A mineral oil lubricant comprising unsaturated polymers extracted from a light petroleum oil fraction cracked in the vapor phase chemically combined with sulphur."

It is pointed out by both the Examiner of Interferences and the board that the count in this case is narrower than the counts in interference No. 71,941 in that, as stated by the board, it "requires that the light petroleum oil fraction employed has been cracked in vapor phase."

■ This distinction, however, is not claimed to be of moment in the case. Upon the questions of reduction to practice and the right of Chittick to make the counts, as well as upon diligence on part of Lyons, both cases stand upon the same plane.

For the reasons stated by us in interference No. 71,941, supra, therefore, the decision of the board in the instant interference is also reversed.

Reversed.