39 C.C.P.A.(Patents)

### ALLEN v. BLAISDELL et al.
### Patent Appeal No. 5838.

United States Court of Customs and Patent Appeals.

March 18, 1952.

Rehearing Denied May 23, 1952.

528

A. Yates Dowell, Washington, D. C., for appellant.

Robert I. Dennison, Washington, D. C., and Harold A. Dreckman, Long Beach, Cal., for appellees.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON and WORLEY, Judges.

GARRETT, Chief Judge.

This is an appeal from the decision of the Board of Interference Examiners of the United States Patent Office awarding priority to the party Blaisdell in an interference proceeding involving a single count which reads: "A bearing shim adapted to be placed under a shaft bearing and formed of shim stock, said shim being tapered from the center to both edges thereof."

Cocklin filed November 9, 1945, which was prior to the filing dates of both Allen and Blaisdell, and it is said in the decision of the board that "all of the parties filed preliminary statements and briefs." Cocklin, however, took no testimony and both Blaisdell and Allen were awarded dates for reduction to practice long prior to his filing date and he took no appeal to this court. The board states, in substance, that Cocklin did not contend that Blaisdell and Allen did not establish dates for reduction to practice earlier than his but that, assuming they did, all of the parties were barred by public use of the invention due to sales incorporating it more than a year prior to the earliest filing date. It is stated also that Cocklin recognized that public use proceedings are independent of interference preceedings and that the board in its discretion could only make a recommendation under Patent Office Rule 259, 35 U.S.C.A.Appendix. After stating its rea-

son for non-action, the board refused to make a recommendation under the rule. So, Cocklin is no longer a party litigant in the case, nor is the question of public use involved before us.

■ The application of Allen was filed April 19, 1946; that of Blaisdell June 24, 1946. As the junior party it was incumbent upon the latter to establish priority by a preponderance of the evidence. The Board of Interference Examiners found that he did so and he was accorded reduction to practice "as of the latter part of 1936." This substantially conformed to his claim in his preliminary statement.

Allen was awarded conception "no later than October 1939" and reduction to practice "no later than November 1939." Those dates were in substantial harmony with the claims in his preliminary statement.

Upon the record presented the issue is clear cut and practically free from complexity.

If the finding of the board with respect to Blaisdell's time of reduction to practice and its further finding that there was no abandonment of the invention on his part be sustained, he is entitled to prevail. On the other hand, if the testimonial record does not sustain the board's findings in both particulars, its decision must be reversed and priority awarded the senior party, Allen.

There is no challenge of the findings respecting Allen's activities in any material particular.

As to Blaisdell, there is no attack upon his veracity, but the accuracy of his memory as to certain details—not, in our opinion, very important—is questioned, and it is contended that corroboration of material parts of his evidence is lacking and strenuously urged that he abandoned the invention which became, so far as he is concerned, merely an abandoned experiment.

■ It is elemental in patent law, of course, that in interference cases a claimant, no matter how honest and truthful he may be, cannot prevail upon the basis of his own oral testimony standing alone. The rule which requires corroborating evidence is inviolable and the tribunals of the

Patent Office and the courts may not depart from it. The corroborating evidence may be presented in different ways, to be sure —in diaries, note books, written instruments of various kinds, or by purely oral testimony—but there must be such evidence and it must be convincing. However harsh the rule may seem at times, the absolute necessity for it becomes apparent upon reflection. Without it the patent system might be virtually destroyed by fraud and perjury.

In the instant case, Blaisdell himself testified at length, being thoroughly cross-examined by counsel for Allen, and in addition to his own testimony, there was introduced on his behalf that of seven other persons. One of these was his wife, who knew practically nothing concerning the critical phases of his work, and another was his attorney who testified merely as to the making of a sketch at the time Blaisdell consulted him respecting the preparation of a patent application to which reference is made hereinafter. His principal corroborating witnesses were George A. Mitchell and C. S. Prowell. Others of the witnesses gave testimony which showed that at an early date they had some knowledge of his ideas relative to a shim of the kind at issue for use with automobile bearings, but their testimony alone would not have been sufficient to meet the test of corroborating evidence.

The factual records of both parties to the interference were reviewed carefully and fairly in the decision of the Board of Interference Examiners. As to the activities of both parties considerable space was required to state the findings of fact, giving proper attention to the material details.

As to Blaisdell, the board found (references to pages of the record, etc., being deleted):

"Blaisdell alleges dates of inventive acts as early as the year 1934. Since the fall of 1945 he has manufactured automotive parts but prior to that time he was an automobile mechanic operating his own shop in Long Beach, California. Among the witnesses appearing in Blaisdell's behalf are George Mitchell who operated a large used car agency and C. S. Prowell

also in the used car business. Both of these gentlemen utilized Blaisdell's services as a mechanic.

"In 1934 or 1935 Mitchell had a 1933 Plymouth car that needed new bearings and Blaisdell was given the job. Blaisdell had had difficulty securing oversize inserts in Long Beach and to meet the difficulty conceived of utilizing one piece tapered shims to place under the old inserts. To try out the idea Blaisdell offered to place the shims in the Plymouth without charge. Mitchell accepted and the job was done. This was repeated in 1936 with an early 1936 Oldsmobile which had been in the dust bowl area. Both of these cars were later sold with a mechanical guarantee and according to Mitchell's recollection their oil pressure and mechanical condition otherwise were satisfactory. Mitchell did his own financing on the cars and it was easy for him to check their condition as the purchasers came in to make their payments.

"Mitchell due to the lapse of time no longer had records on those cars and he didn't actually crawl down in the pit and watch Blaisdell put the bearing assemblies in the engine. Nevertheless Blaisdell did show him the shims which he had tapered by grinding and how he was going to assemble them. The shims were not subsequently removed from those cars by Blaisdell which it is obvious they would have been had the installation not been successful.

"Prowell's testimony is more positive than Mitchell's since the installation pertained to a De Soto car that he intended for his own temporary use. The installation which Prowell claims he witnessed took place in 1935 and was also done free of charge. Pertinent excerpts from Prowell's testimony are as follows:

"Q. 20. When did he talk to you about this tapered shim? A. My first recollection of that is in with a particular automobile. I bought a 1934 De Soto that was about a year old at the time. As near as I can recollect, it was approximately one year old, and the bearings were loose on it, and I sent it over to his place to get new inserts put in; and we were having a lot of trouble with the insert bearings

on different insert model automobiles because they didn't stay put too well; and he—I sent it over and he came over himself—he either called me over to his place or came over to my place; and he said he had a new deal that he wanted me to try. I was going to use this car for a trip and he had something new that he wanted me to try, and he showed me some kind of a laminated shim that was all in one piece, and it was brand new to me; but he said that he had just rigged the thing up—or had been working on it, or something of that nature. But anyway he had the thing and it was brand new to me at the time, and I was going to take this car on a trip. See, I happened to be from the northwest part of the country and was going to use it for a trip going up there and back. And he wanted me to try it—said that the labor or anything else wouldn't cost me anything, if I just tried it out and gave him and [sic] report on it. It was a cinch to me; if I can save a dollar, it was a dollar made, so I did it.

"Q. 21. What was this date as you remember it? A. The car was a 1934 De Soto and the deal came about—about a year after that time. The car was a 1934 and it was approximately a year old.

"Q. 22. So it was during the year 1935, is that right? A. It would have been in the year 1935 somewhere, or fall of 1935, as near as I can recall. I remember the car well enough because I used it for several months.

"Q. 23. Did you observe the tapered shims as they were put into the automobile? A. Oh, yes, they were put into the car, yes, because they were something brand new and he wanted me to try it out for him.

"Q. 24. Did you see it go into the automobile; did you see it placed in the automobile? A. Well, now, just a minute here. If I remember rightly, the kid that was working for me and myself watched the darned thing being done. I think that there were two of us that looked at the thing being done, because it was something new, and any time I can see something new being done, if it goes into my pocketbook, I am going to look into it.

"Prowell further testified that he observed the shims were tapered and the installation 'worked out fine.' He drove the car more than a month and when he sold it the shims were still in it.

"Following these installations Blaisdell on March 24, 1936, filed an application for patent Serial No. 70,637 illustrating a one piece tapered shim upon which the count clearly reads. Blaisdell also in 1936 wrote to a number of piston ring and other manufacturers seeking a contact that could fabricate and distribute the tapered shim. Replies from nine of the companies are in the record and they on the whole show lack of interest in the undertaking. Apparently it was not a simple matter to manufacture a tapered shim on a production basis. Being unable to manufacture the shim himself or get anyone else to do it Blaisdell forfeited his application which had been allowed on November 23, 1937.

"Years later in 1945, Blaisdell, according to his testimony, devised a laminated shim which he was able to manufacture and which he started to sell in September, 1945. Blaisdell admits the laminated shim was not engine tested by him and his evidence of sale in September, 1945, is his own invoice. However, Blaisdell's activities with the laminated shim are not particularly important to his case except insofar as they indicate that Blaisdell never abandoned the idea of a tapered shim in some form and that as soon as he was enabled to manufacture the item he presented it to the automotive trade.

"It is urged among the arguments of the opposing parties that Blaisdell's early installations for Mitchell and Prowell amounted to mere abandoned experiments. We do not accord with this view. Blaisdell pioneered with the one piece tapered shim and went as far as he could with it until he was stopped by inability to manufacture it. The tapered shims made by hand and installed in the Mitchell and Prowell cars worked successfully as corroborated by those individuals. Had they been unsuccessful or abandoned experiments they would have been removed and new inserts put in since the cars were sold with a mechanical guarantee. Also had they been unsuccessful Blaisdell would not have wasted money in the filing in 1936 of his earlier application. In the war years Blaisdell could not manufacture the shim. In 1945 he conceived the laminated shim which could be readily manufactured and which he thought was an improvement but this does not mean that the basic invention was unsuccessful. It is held that Blaisdell's early work was not an abandoned experiment and that his record establishes an actual reduction to practice for him as of the latter part of 1936."

We have examined with care the criticisms made of the testimonial record presented on behalf of Blaisdell and have considered carefully the arguments relating to the allegations of lack of requisite corroboration of the acts constituting his conception and reduction to practice. No documentary evidence in the form of notations made at the time he inserted the shims in the cars of Mitchell and Prowell was introduced, but unless those witnesses gave false testimony, we find nothing whatever to raise any doubt as to Blaisdell having done exactly what he said he did, and certainly the record shows nothing which indicates the slightest lack of veracity on their part or on the part of Blaisdell himself.

Upon the matter of Blaisdell's alleged abandonment of the invention, we feel that the facts and circumstances shown in the record and recited in the board's decision fully justify the holding that there was no abandonment on his part, nor was his work an abandoned experiment.

In view of our conclusion respecting Blaisdell's reduction to practice as early as the latter part of 1936, it is unnecessary to review the record of Allen, since he made no claim of a reduction to practice earlier than November 1939, the time awarded him below.

The decision of the Board of Interference Examiners is affirmed.

Affirmed.