40 C.C.P.A. (Patents)

### MORWAY et al. v. BONDI.
### Patent Appeal No. 5915.

United States Court of Customs
and Patent Appeals.
April 15, 1953.

Edwin M. Thomas, Washington, D. C. (W. F. Weigester and C. D. Stores, Washington, D. C., of counsel), for appellants.

Herbert L. Shepard, Chicago, Ill. (Edward B. Beale, Washington, D. C., of counsel), for appellee.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Judges.

JOHNSON, Judge.

This is an appeal by the party Arnold J. Morway, Alan Beerbower and John C. Zimmer, hereafter designated Morway et al. or simply Morway, junior party in patent Interference No. 83,557. The appeal is taken from the decision by the Board of Interference Examiners awarding priority of invention to the senior party, Arnold A. Bondi, hereinafter referred to as Bondi. The party Morway filed an application for patent, Serial No. 718,896, on December 27, 1946, entitled "Lubricating Grease Compositions" and the party Bondi filed an application, Serial No. 655,887, on March 20, 1946, entitled "Production of Anhydrous Soda Base Lubricating Greases."

Since appellants are the junior party, the burden is upon them to prove priority of invention by a preponderance of evidence. Allen v. Blaisdell, 196 F.2d 527, 39 C.C.P.A., Patents, 951.

There are two counts in issue, which read as follows:

"2. A soda soap base lubricating grease containing 0.05% to about 1% of a polyethylene glycol having an average molecular weight in excess of 200, said percentage range being taken on the weight of the grease.

"3. A lubricating grease composition comprising mineral lubricating oil thickened to a grease consistency by the sodium soap of substantially saturated higher fatty acids and containing about 0.05% to about 1% of polyethylene glycol having an average molecular weight between about 200 and about 7000."

As appears from the counts, the invention here involved relates to a soda base lubricating grease composition. The novel feature of the counts, according to the parties, is the use of 0.05% to 1% of a polyethylene glycol having a molecular weight in excess of 200 as an additive or modifier. Use of this additive in the stated proportions is said to increase the mechanical stability of the grease, thereby making it particularly suitable for use as a lubricant in anti-friction ball and roller bearings which must be lubricated over extended periods of time at high temperatures. According to Morway, use of this additive results in smooth, relatively non-fibrous greases particularly suitable for use as wheel bearing greases. Also, according to Bondi, this modifier inhibits bleeding of oil from the grease upon repeated heating and cooling of the same, this being a very desirable characteristic in such applications.

The board awarded Bondi the date of June 14, 1945 for conception. It further held that Bondi is entitled to the date of October 31, 1945, which is the filing date of his copending application, Serial No. 625,966, as a constructive reduction to practice. These holdings are not questioned by appellants Morway et al.

In its decision, the board also awarded Morway et al. the date of April 12, 1945 for conception. This award is not now questioned by Bondi. Counsel for Morway et al. appear to contend that the board

should have awarded to appellants the date of January 31, 1945 for conception. However, for reasons presently set forth, the award of that date clearly would not alter the outcome of the case, and we therefore think it unnecessary to discuss this contention in detail.

With the foregoing dates established, it is apparent that appellants, as junior party, must prove either (1) an actual reduction to practice prior to the earliest date to which appellee may be entitled for actual or constructive reduction, Holslag v. Steinert, 143 F.2d 661, 31 C.C.P.A., Patents, 1116; or (2) the exercise of reasonable diligence from just prior to appellee's entry into the field on June 14, 1945, to a later actual or constructive reduction to practice. Hull v. Davenport, 90 F.2d 103, 24 C.C. P.A., Patents, 1194.

The board held that the record for Morway et al. did not establish an actual reduction to practice prior to their filing date of December 27, 1946, and that they were lacking in diligence in reducing to practice.

We note at this point that the company by which Morway et al. were employed already had on the market a wheel bearing grease known as Essoleum B, which was successfully usable in most applications such as passenger cars and ordinary truck duty. However, Essoleum B had sometimes given poor results in service in high speed, heavy duty trucks where high wheel bearing temperatures were encountered due to transmission of heat from the brake drums. It is clear from the record that the efforts of Morway et al. which resulted in the grease of the issue counts were directed primarily to developing a high performance wheel bearing grease usable under such high temperature, heavy service conditions.

It is true, as argued by counsel for Morway et al., that the counts are not restricted to any particular type of lubricant or use, such as a high temperature wheel bearing lubricant. Nevertheless, it is proper to consider as a factor in this decision that Morway et al. were primarily seeking a high performance lubricant of this type in order to meet the shortcomings of their

company's existing product. See Chittick v. Lyons, 104 F.2d 818, 26 C.C.P.A., Patents, 1382.

Morway et al. contend that they made two distinct actual reductions to practice prior to appellee's constructive reduction to practice on October 31, 1945.

Appellants contend that there was a first reduction to practice between January 31, 1945 and March 13, 1945. It is claimed that on January 30, 1945 Beerbower, one of the joint appellants herein, compounded a grease containing Carbowax 1500,[1] which grease is said to meet the issue counts. That grease was subjected to a standard Norma-Hoffman oxidation test, in which a sample of the grease is enclosed in a pressure bomb filled with oxygen gas to a pressure of 110 pounds per square inch. As the grease becomes oxidized, with the oxygen entering into chemical reaction with the grease, the pressure gradually drops. The time required for the pressure to drop 5 pounds, from 110 down to 105, is said to be a good indicator of the oxidation resistance of the grease. The slower the pressure drops, the more oxidation resistant is the grease product. It is claimed that the results of this test were good, and counsel for Morway et al. contends that there was an actual reduction to practice when this grease was successfully tested in the Norma-Hoffman oxidation test.

Counsel for Bondi argues, *inter alia,* that the events relied on to establish this first alleged reduction to practice are not properly corroborated as required by law. We shall assume, without deciding, that there is proper corroboration.

■ Certain products or substances may be held fully reduced to practice when made, without the need of tests, because the utility in the pertinent art is well understood. Larson v. Eicher, 49 F.2d 1029, 18 C.C.P.A., Patents, 1497. In many cases, however, mere compounding does not establish a reduction to practice, particularly when the inventor's aim is to produce a new product superior to a then-existing product. Saklatwalla v. Marburg, 172 F.2d 227, 36 C.C.P.A., Patents, 791. Thus, in the latter case we held that the mere preparation and routine laboratory testing (for tensile strength, yield strength, and the like) of alloy steel heats having the composition defined by the counts did not establish an actual reduction to practice.

■ Similarly, the mere mixing of ingredients to form a lubricant composition meeting the counts can not, without more, be considered an actual reduction to practice of a lubricant intended to meet a certain problem. Knutson v. Gallsworthy, 82 App.D.C. 304, 164 F.2d 497. This rule is clearly implicit in our decision in Chittick v. Lyons, supra.[2] In the present case, the problem is not in the production *per se* of the grease of the counts. Nor is it merely in the production of some or any lubricant, for it is obvious that any mixture consisting of a lubricant base plus an additive or modifier would be expected to have lubricating properties. The problem facing Morway et al. in the invention herein was to produce a grease, through the use of proper additives, which would be suitable for use as a high temperature, heavy duty wheel bearing grease. For these reasons, the mere production by Morway et al. on January 30, 1945 of a grease mixture meeting the counts does not establish an actual reduction to practice. It is necessary that there be something more, such as demonstration by tests that this grease mixture possessed the properties desired. Knutson v. Gallsworthy, supra.

■ An actual reduction to practice might have been established by showing commercial production.[3] Likewise, ade-

---

1. By stipulation, Carbowax is a polyethylene glycol of the type called for in the counts.

2. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L. Ed. 610, and Kyrides v. Bruson, 102 F.2d 416, 26 C.C.P.A., Patents, 986, which appellants cite as authority to the contrary,

are distinguishable for the reasons given by the court in Knutson v. Gallsworthy, 164 F.2d at page 508.

3. Commercial use or production is, of course, not essential to a reduction to practice. See Harrison v. Cadwell, 39 F. 2d 704, 17 C.C.P.A., Patents, 1024.

quate field tests under proper conditions, showing suitability of the grease for the purpose intended, may be relied on. Laboratory tests may also constitute a reduction to practice under some circumstances, but such tests must simulate actual service conditions with sufficient clearness to render it reasonably certain that the subject matter will perform its intended function in actual service. Chittick v. Lyons, supra.[4]

In this case, Morway et al. rely on the above-mentioned Norma-Hoffman laboratory test as establishing a reduction to practice of the grease mixture allegedly made up on January 30, 1945.

Dr. George McNulty, an expert witness for the party Morway et al., testified on cross-examination as follows:

XQ109 Does either this [A.S.T.M.] penetration test which you have described, or the Norma-Hoffman bomb test, prove that a grease will not fail in actual use? A. They are only indications. They are not 'proof.'

"XQ110 Is there any completely satisfactory test that will prove that a grease will not fail when it is used? A. No laboratory test is complete and satisfactory. They are only indications.

"XQ111 In other words, if a laboratory test—either this Norma-Hoffman test, or the penetration test—is bad, you can be pretty sure that the grease will not be good; is that correct? A. That is right.

"XQ112 But, even though the test is good, you cannot be certain that the grease will not fail, in some respect or other, when actually used? A. You cannot be certain: but, by a combination of a number of tests, you have indications."

Dr. Hollis L. Leland, an expert witness for the party Morway, testified as follows on cross-examination:

"XQ209 Isn't it a fact there is no fully satisfactory laboratory test to prove whether or not a grease will fail,

under service conditions? A. May I ask the question again?

"XQ210 I will put it a little differently: To prove that a grease will not fail, under service conditions? A. There is no satisfactory test to prove that it will not fail under any and all service conditions. I state it that way because 'service conditions' can vary widely, under abnormal conditions of operation: most unexpected results can occur, although it is, still, a service operation.

"XQ211 This Norma–Hoffman bomb test merely shows the stability, or lack of stability, of a grease toward oxidation; is not that correct? A. That is correct.

"XQ212 It is no indication at all that it might not break down or fail, under various service conditions, is it? A. From the standpoint of oxidation, in service—deterioration from oxidation, it is a very informative test.

"XQ213 But only insofar as oxidation is concerned? A. Yes, that is right: oxidation, and storage life in the can."

Mr. Alan Beerbower, one of the appellants herein, testified on cross-examination that the Norma–Hoffman bomb test *merely measures resistance of the grease to oxidation* under static or storage conditions, but not under service conditions; *and that he would not be able to predict service life from Norma–Hoffman bomb results.*

In view of the foregoing testimony by appellants' expert witnesses, we think it clear that a successful Norma–Hoffman laboratory test falls far short of simulating actual service tests with sufficient closeness to constitute a reduction to practice under the above-stated rule from Chittick v. Lyons, supra.

Appellants contend further that there was a second actual reduction to practice of a successful wheel bearing grease on October 2, 1945. Miss Rosemary O'Halloran,

---

4. It is here noted that in the Chittick case we had before us the question of reduction to practice of a *lubricant* intended for use in high pressure applications.

a technical assistant to the joint inventors Morway et al., prepared a grease meeting at least count 2 on September 28, 1945. Miss O'Halloran tested this grease in the so-called Ford Wheel Bearing Test on October 2, 1945, and in her notebook she evaluated the test results as "very good." It is claimed that this latter laboratory test constitutes an actual reduction to practice.

A description of the Ford Wheel Bearing Test is contained in the following paragraph from appellants' exhibit 30, which is a copy of a weekly progress memorandum:

"A program has been initiated to develop a new wheel bearing grease with performance superior to that of Essoleum B, the Company's present premium product. Essoleum B qualifies as Army General Purpose Grease No. 2, under Specification 2–108A, but has proved to be somewhat unsatisfactory in the *recently developed* Wheel Bearing Test Machine. This service test, which consists of operating a Ford wheel bearing for six hours at 450 rpm. and 220° F., *may* be adopted by the trade as a measure of the quality of wheel bearing greases." [Italics supplied.]

The record with respect to the Ford Wheel Bearing Test is sparse. We find nothing therein which convinces us that this test so closely simulates actual service conditions that performance of the grease in its intended function in actual service is reasonably predictable. This test was then only recently developed, and its use as a standard test was at that time only a future possibility. It is clear from the record that McNulty and Leland, who are employees of appellants' company, were obviously familiar with this test when they testified as expert witnesses for appellants in 1950. Yet, they testified then that there is no fully satisfactory laboratory test which will prove that a grease will not fail in actual use. (See the above-quoted excerpts from the testimony by these witnesses.)

Furthermore, it seems to us that the fair inference from the circumstances disclosed by the record is that appellants (and their employer company) did not, at that time, attach such significance to this test as to indicate a reduction to practice. It appears from appellants' exhibit 34, dated August 12, 1946, that field tests were to be run August 28, 1946 in Rochester "under supervision of Sales Engineering." It also appears from appellants' exhibit 37, a weekly progress report dated November 21, 1946, that the grease was then being evaluated in field tests being conducted in the Rochester and Baltimore areas.

Moreover, we deem it significant that appellants delayed at least 14 months after the Ford Wheel Bearing Test in commercializing the product, although their field is a competitive one and the company employing them had a definite need for the grease of the issue counts; it is also similarly significant that the patent application was delayed for practically 14 months after the test. See Chittick v. Lyons, supra. It seems to us that if appellants had *then* been satisfied as a result of Miss O'Halloran's test that the grease tested was a commercial or patentable improvement over existing products, these delays would not have occurred. See Saklatwalla v. Marburg, supra.

In view of the foregoing, we hold that appellant has not established by a preponderance of evidence that the wheel bearing test of October 2, 1945 constitutes an actual reduction to practice. Appellant relies considerably on statements by Leland and McNulty that the grease tested by Miss O'Halloran formed the basis, with slight modification, for moving into full scale manufacture of a commercial grease. The record fails to convince us that this was the result of Miss O'Halloran's test on October 2, 1945. Indeed, for reasons previously discussed, we think the fair inference from the evidence before us is that it was not.

Dr. Leland briefly testified, among other things, that he put the grease prepared and tested by Miss O'Halloran in his own car, and that it was still there when he sold the car 50,000 miles later. Appellants seem to rely on this also as establishing a reduction

to practice prior to October 31, 1945. With respect to this, the board stated:

"* * * There appears to be no documentary evidence on this test showing time or detail. The 50,000 miles mentioned by Leland run on his own car, in the absence of evidence to the contrary, is presumed to have taken place over perhaps several years for obviously the services of the head of a research group were required in the laboratory and he would have neither the time nor likely the inclination to depreciate his personal car any faster than normally.

"Moreover there is nothing to show that there was anything about this test of the grease to demonstrate performance superior to Essoleum B under severe temperature conditions. Being passenger cars and laboratory test cars of unknown specification the test may have been merely to determine if ordinary temperature performance was satisfactory as compared to Essoleum B. This, as indicated in the foregoing, would not have been regarded by the company as sufficient in its opinion and in fact it wasn't regarded as sufficient because the company proceeded to plant scale preparation and fleet testing."

█ We concur with the board's evaluation of this testimony. As we see it, the board did not hold that the grease was not reduced to practice until it wore out, as counsel for appellants contends it did. Rather, we think the board was of the opinion, for the reasons it set out in the first paragraph quoted, that this testimony did not establish an actual reduction to practice by a preponderance of the evidence. We agree in this with the board. If appellants intended to rely on this occurrence as an actual reduction to practice, it was incumbent upon them to present testimony adequate to meet their well known burden of proof. Of course, it might well be, as the board indicated in the second paragraph quoted, that even if adequately proven this incident would not constitute a reduction to practice in the circumstances of this case.

█ Counsel for appellants seems to charge the board with holding that experimentation subsequent to the above tests necessarily negatived a reduction to practice of the issue counts. After a study of the board's opinion, we do not think the charge is justified. Appellants have failed to establish by a preponderance of the evidence a timely reduction to practice meeting the requirements of the law (e. g., fleet service tests under actual conditions for which the grease was intended, with results considered satisfactory at that time). Had they done so, it is clear that subsequent experimentation for improvement purposes would not have negatived the reduction to practice and its legal effects.

█ Thus, appellants, although first to conceive, were last to reduce to practice. If they are to prevail, they must affirmatively establish continuing and reasonable diligence in reducing to practice or reasonable excuse for failure to act. Such diligence must be shown from a date immediately prior to the time that Bondi conceived, on June 14, 1945, until reduction to practice by themselves as first conceivers. Scharmann v. Kassel, 179 F.2d 991, 37 C.C.P.A., Patents, 903; Hull v. Davenport, supra.

The board held that "Morway et al. were not reasonably diligent for a substantial period of weeks before and after June 14, 1945."

The record shows the following activities by appellants:

On June 7, August 1, August 15, and September 28, 1945, greases meeting the counts were prepared, and laboratory tests, such as the A.S.T.M. penetration test, were conducted on them.

On October 2, 1945, Miss O'Halloran conducted the above-discussed Ford Wheel Bearing Test on the grease prepared September 28.

On December 26, 1945, a grease meeting the counts was prepared, and laboratory tests conducted on it.

The record then shows further activities (mainly aimed at possible commercial exploitation of the grease in issue) in February, May, August, and November of 1946.

There was no activity at all between June 7 and August 1, 1945, thereby creating a hiatus of one and one-half months right at the outset of the critical period when Bondi entered the field. There is a further hiatus of one and one-half months, during the early part of the critical period, from August 15 to September 28, 1945, when there was no activity at all by Morway et al. It seems manifest from the above chronology that the activities by Morway et al. from early June 1945 to December 1946 were quite sporadic throughout that period.

█ In our opinion, the foregoing activities by appellants do not constitute reasonable diligence in reducing the invention to practice during the critical period.

█ Appellants have introduced testimony to the effect that the joint inventors herein and other assisting members of the research team which developed the grease of the issue counts had many other projects and duties. For example, there is testimony indicating that Mr. Morway's primary assignment at the time in question was the development of a carbon black lubricant; and that Mr. Beerbower's primary assignment was the development of a continuous process for manufacturing greases. When the party first to conceive voluntarily lays aside his inventive concept because he is engrossed in pursuit of other projects, this is generally not an acceptable excuse for failure to act diligently in reducing to practice. Scharmann v. Kassel, supra. Clearly there may be circumstances creating exceptions to this rule, but we find no such circumstances in this record.

█ Morway et al. also seek to explain their lack of diligence by reference to wartime assignments which allegedly took first call on their time. In proper cases, war activities may reasonably excuse the first conceiver's failure to act diligently, but lack of diligence is not excused by a mere assertion that the applicant was engaged in war work. Scharmann v. Kassel,

supra. We fail to find in the record before us adequate evidence of such war activities as would excuse appellants' lack of reasonable diligence.

█ We wish to note one further point. We desire to rebut any inference from our earlier discussion that the only actual reduction to practice by which appellants could have prevailed must necessarily have been of a grease superior to Essoleum B.

Appellants' new grease was submitted by their company to the Rock Island Arsenal for qualifications tests,[5] and it was approved as of December 18, 1946 as a General Purpose Grease No. 2 meeting U.S.A. specification 2–108. The board held this was not a reduction to practice, stating:

"* * * The late date would not be particularly helpful to Morway, et al. but in any event the approval is not of significance in establishing superiority to Essoleum B for the latter also qualified as an Army General Purpose Grease No. 2 and there is nothing to show that the approval was based on differing field tests."

We think the board erred in this latter holding. It seems to us that when appellants' company submitted this grease to the Ordnance Department of the Army for these qualifications tests it was implicitly offering to furnish the grease to that department if it desired to purchase the same. We think that in the circumstances of the case this constitutes an actual reduction to practice notwithstanding that there is *no* evidence of record establishing that the grease tested by the arsenal was superior to Essoleum B. This error of the board is non-prejudicial, however, since a reduction to practice as of December 18, 1946 (or even November 20, 1946) would not entitle Morway et al. to an award of priority.

For the reasons hereinbefore set out, the decision of the board awarding priority to Bondi as to counts 2 and 3 is hereby affirmed.

Affirmed.

5. It appears from appellants' exhibit 36 that this may have been done on November 20, 1946; the record is not clear on the point.