52 CCPA

**Alvin L. BREEN, Appellant,**

v.

**Walter A. MILLER and Herbert G. Stine, Appellees.**

**Patent Appeal No. 7293.**

United States Court of Customs and Patent Appeals.

July 1, 1965.

James T. Corle, Wilmington, Del., A. Newton Huff (Frederick Schafer, Washington, D. C., of counsel), for appellant.

Walter C. Kehm, New York City (John F. Hohmann, New York City, Paul A. Rose, Washington, D. C., of counsel), for appellees.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

MARTIN, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority of invention in Interference No. 90,460 to the senior party, Miller and Stine, hereinafter Miller et al. The issue of the interference is a single count to a process defined as follows:

> The method which comprises extruding a filament of an intimate mixture of two mutually incompatible fiber-forming, organic polymers, moderately stretching said extruded filament at a temperature near the extrusion temperature and thereafter further stretching said filament.

Miller et al. are involved in the interference on the basis of application serial No. 416,414, filed March 15, 1954 and assigned to Union Carbide Corporation. The involved application of the junior party Breen, appellant here, is serial No. 465,538, filed October 29, 1954. That application is assigned to E. I. duPont de Nemours and Co., hereinafter Du Pont.

Breen introduced evidence which he relies on as proving reduction to practice on three separate occasions prior to the Miller et al. filing date. That evidence includes testimony of four employees of Du Pont involved in the alleged reductions to practice and ten documentary exhibits. The witnesses were Breen himself, a research assistant, O'Brien, a research operator working under Breen's supervision, Hebeler, a research engineer, and Rivers, a research supervisor who supervised both Breen and Hebeler.

Miller et al. introduced no evidence. They accordingly are restricted to their filing date for conception and reduction to practice. Blicke v. Treves, 241 F.2d 718, 44 CCPA 753.

There is no evidence of activity by Breen between the entry of Miller et al. into the field on their filing date and Breen's own filing date and thus no question of diligence is involved. Also, the board stated that Miller et al. observed before it that all dates sought to be proved by Breen are prior to their filing date, and conceded, in order to simplify the issues, "that if it is held that Breen did prove an actual reduction to practice of the count, he need not prove conception as a separate act." It follows that the issue here is whether Breen did attain an actual reduction to practice through the activities on which he relies.

The first of the three activities relied on by Breen involves an experiment iden-

tified as run B7NV5,[1] which took place on April 29, 1940. Another run, identified as B10VN6, which took place on May 19, 1949, forms the basis for the second alleged reduction to practice. The third event relied on by Breen is an experiment conducted by Hebeler on June 8, 1949.

The B7NV5 run was made by O'Brien on Breen's instructions. Ground and mixed nylon and polyethylene terephthalate, the latter referred to as polymer V, where formed into a molten mix which was run through a standard sand pack and a spinneret having multiple openings of 9 mil diameter under conditions noted in a contemporary data sheet in evidence as Exhibit 2. The extruded filaments were taken up on 13 bobbins. O'Brien testified that the size of the filament on the bobbins was something less than the 9 mil diameter of the spinneret openings "because of the low stretch while the polymer was soft going away from the spinneret." After O'Brien collected the bobbins he "took samples off of each for further processing and stretching." Referring to a page of a notebook he kept at the time of the project, O'Brien testified that, in May of 1949, he drew samples from one bobbin, No. 7, to various lengths designated 2x, 3x, 4x and 5x, meaning 2, 3, 4, and 5 times their original length on the bobbin, "at 80 degrees [Centigrade] hot roll temperature." Samples from other bobbins were stretched 3x at the same temperature and skeined and boiled to obtain shrinkage values. Other such samples were sent to the physical test laboratory of the organization for determination of stress-strain and filament denier, to the photomicrographic laboratory "for pictures," to the analytical laboratory for nylon determination, and for x-ray examination.

Referring to the filaments obtained in Run B7NV5 after they were spun, Breen himself testified:

\* \* \* We handled the fibers to determine if they were useful fibers.

A standard test that all researchers in this area would use following an experimental spinning of this sort would be to merely stretch the material by hand, feel the strength, feel the elongation characteristics, and so on. This material was hand drawable and was strong, a clearly useful material.

The B10VN6 run was also made by O'Brien, who referred to contemporary notebook pages and a log data sheet in testifying about it. That run involved susbtantially the same procedure carried out in B7NV5 except that the polymers were premixed in a molten condition before being charged into the extrusion unit. O'Brien testified that he wound six bobbins of filament during this run, that drawing of the filament took place very close to the face of the spinneret and that the windup speed was chosen to give a minimum drawing. As before, samples were taken off some of the bobbins and sent to the photomicrograph laboratory and other samples "were drawn to 3x." The log sheet relating to this run has attached to it six photomicrographs which O'Brien stated were provided him by the laboratory in response to his request for such photographs of both the samples direct from bobbins and samples additionally drawn at 3x. O'Brien also testified, with reference to another page of his notebook, that samples from the bobbins drawn at 3x at 80 degrees Centigrade were sent to the physical test laboratory "for stress-strain and filament deniers." The testimony shows that run B10VN6 produced only six bobbins of fiber because

---

1. Breen and O'Brien explained that B7NV5 was Breen's code meaning "B" for Breen; "7" for the seventh in the series of experiments; "N" for nylon, "V" for polyethylene terephathalate which they termed polymer V; and "5" for "the fifth in the series of nylon/Polymer V experiments." The record also shows that the designation B10VN6 for the subsequent experiment involves the same code with the interchanging of "N" and "V" having no significance.

the operation broke down thereafter as a result of running low on polymer.

The run by Hebeler, conducted on June 8, 1949, involved spinning from mixes of different proportions of polymer V and polyethylene with the resulting filaments wound at different selected speeds. Questioned whether the filaments were tested, Hebeler stated:

> The tests that I performed—it was routine practice to hand-draw the yarn. In this particular case in the hand-drawing the fiber was tenacious, and in one case in particular, Example P5–6, I noted that the fiber developed crimp after the hand-drawing.

Hebeler also stated that he drew some of the filaments to four times their original length and submitted samples to the physical testing laboratory for checking their physical properties.

The record does not include reports from the laboratories on the tests requested by O'Brien and Hebeler. However, periodic work reports covering work done in May and June of 1949 and issued under Rivers' name were introduced in evidence and Rivers and Hebeler testified that certain figures therein resulted from the work of O'Brien and Hebeler.

With regard to the matter of compliance of the experiments with the requirements of the count, the board was satisfied that the nylon and polymer V used by O'Brien, as well as the polyethylene and polymer V used by Hebeler, were mutually incompatible fiber-forming organic polymers. With respect to nylon and polymer V, it noted testimony as to incompatibility by Breen, O'Brien and Rivers and stated that Miller et al. produced nothing in derogation of that testimony. It specifically noted testimony of Hebeler and Rivers as to polyethylene and polymer V being incompatible.

The board also specifically held that the evidence regarding the B7 run established that it supported the steps of "extruding" and moderately "stretching" the extruded filament. It also reached the same conclusion with respect to the B10 run and Hebeler's experiment.

We think the board was clearly correct on those findings. The evidence is conclusive that all three experiments involved mutually incompatible fiber-forming, organic polymers and included the steps of "extruding" and "moderately stretching" the extruded filament.

The board, however, regarded the additional or further stretching of filament stamples by O'Brien as "only a part of further tests" on the "moderately" stretched fibers on the bobbins and stated:

> * * * We have found no testimony indicating any realization that such further stretching was necessary or desirable in a complete process for producing filaments for either of the purposes disclosed in the involved application of Breen.

It then concluded:

> Further, in our view there is insufficient evidence presented in this record relating to tests on the filament produced from the run B7NV5 as the final product of *all* of the steps of the process defined by the count in issue which demonstrate the utility of that filament *as such* or as an intermediate to be further treated to produce fibriles or microfibers which is essential to establishing an actual reduction to practice under the circumstances of this case. See Thomas et al. v. Michael et al., 35 CCPA 1036; 166 F(2d) 944; 77 USPQ 216; 1948 C.D. 392 (395), Birmingham v. Randall, 36 CCPA 780; 171 F(2d) 957; 80 USPQ 371; 1949 C.D. 66 and Chandler v. Mock, 32 CCPA 1183; 150 Fed(2d) 563; 66 USPQ 209; 1945 C.D. 417.

The board took the same view of run B10VN6 stating:

> * * * Thus there is no evidence relating to the stretching by O'Brien at all beyond the fact that he did it and measured shrinkage after a boil-off operation. Accordingly, it is our

view that the run B10VN6 and tests related thereto do not constitute an actual reduction to practice of the count in issue.

It also stated:

The views we have expressed in the foregoing, particularly with respect to Breen's (O'Brien's) run B7NV5, are regarded as being equally applicable to the experiment by Hebeler in that we do not believe that his experiments constitute an actual reduction to practice of the invention in issue and we so hold.

The reference by the board to "the utility of that filament *as such* or as an intermediate to be further treated to produce fibriles or micro-fibers" was based on an analysis it had previously made of Breen's disclosure. In that analysis, it quoted the following from the Breen application:

"It is, therefore, an object of this invention to provide oriented filaments having very small diameters. It is another object of this invention to provide novel filaments which are composed of two polymers in random distribution, one being present as microfibers. It is another object to provide new oriented fibers from condensation polymers, such as polyesters, which fibers have a very small diameter compared with ordinary textile fibers. It is still another object of the invention to provide a new process for making the fibers, such as isolated oriented fine fibers or the composites.

"The objects of this invention are accomplished by dispersing at least two different fiber-forming polymers incompatible with each other and extruding the resultant mixture through a shaped orifice into a medium which sets or fixes the extruded material in the shape desired. *This structure is drawn* and may be *used as such*, or, *the structure may be treated with a solvent for the matrix material* which solvent has little or no solvent action on the other polymer used in forming the microfibers. The *desired oriented microfibers remain* after removal of the solvent and dissolved matrix polymer. The *microfibers* are then *washed* and *dried* by normal techniques." [Emphasis by the board.]

It concluded that "Breen is concerned with the production (1) of a filament to be used somehow as a filament and (2) of a filament as an intermediate structure that is to be reduced by further treatment for producing microfibers of one of the incompatible materials in the composite filament."

We are unable to agree with the board's conclusion that the experiments in question here did not amount to reduction to practice. The count defines a process and is broad, not specifying any particular properties for the filament that is produced. The process practiced in each experiment included extruding a filament of the recited composition and stretching the extruded filament at the temperature stated. Also, the last step of "further stretching the filament" was carried out. In O'Brien's experiments, that last step, as well as the other steps, was carried out on Breen's instructions. Also, filaments that were subjected to the step of further stretching were sent for the same tests as were the filament samples taken from the bobbins without "further stretching." It thus seems to us that the "further stretching" of the former filaments was not regarded merely *as a part of tests on the bobbin filaments* but as a step in the process of providing a useful filament, the properties of which were of the same interest as the properties of the bobbin filament. Thus this is not a situation where a step performed in a subsequent, conceptually separate test is offered as proof of a step of the process.

Concerning reduction to practice of a process, this court stated in Thomas et al. v. Michael et al., 166 F.2d 944, 35 CCPA 1036:

Where the utility of a new product produced by a novel process is not known or apparent, a test is re-

quired to establish reduction to practice of that process. See Bogoslowsky v. Huse, 142 F.2d 75, 78, 31 C.C.P.A., Patents, 1034, 1038. But where the utility of an old product produced by a novel process is known, a test is not required to establish reduction to practice of that process. See Larson v. Eicher, 49 F.2d 1029, 1031, 18 C.C.P.A., Patents, 1497; Fenton R. Brydle v. Harry H. Honigbaum, 54 F.2d 147, 19 C.C.P.A., Patents, 773; Kyrides v. Bruson, 102 F.2d 416, 26 C.C.P.A., Patents, 986.

Not only did the board cite that decision but both parties rely on it in their briefs.

Miller et al. urge that the product of the present process was not known and that tests were required to establish its utility to show reduction to practice of the process. Breen urges that the product should be considered as known, referring to certain patents as showing it is old to extrude a filament from two incompatible organic polymers and that it is old to apply a second stretching to a filament made of a single polymer such as nylon. We agree with Miller et al. that the precise filament produced by the present process is not shown in the record to be old in the art. However, we are not satisfied that the filament's utility is not "apparent." To the contrary, the filament in question so clearly resembles previously known filaments of organic polymers, i. e., nylon, that it obviously would be useful for the same purpose as such filaments. Moreover, the fact that filaments from the test bobbins could be drawn to 2, 3, 4 and 5 times their original length indicates the "further stretched" filaments were not lacking in the strength necessary to be useful.

■ The board seems to have regarded the fact that O'Brien sent samples of "further stretched" filaments to laboratories in the Du Pont organization for tests as demonstrating that he regarded those tests as essential to a determination of whether the process operated successfully. We do not think that conclusion is warranted. It is well established that continued experimentation does not negative a reduction to practice already made. Morway et al. v. Bondi, 203 F.2d 742, 40 CCPA 917. In the present case, tests to obtain more detailed knowledge of the characteristics of the filaments produced by the process would appear to be no more than a logical effort toward realization of the full benefit from a process already found successful.

■ The board also noted that a period of more than five years elapsed between the experiments of O'Brien and Hebeler in 1949 and the filing of the Breen application. It regarded that as indicative that Breen, and those acting for him, did not consider the experiments to constitute a reduction to practice. While delay in filing may under some circumstances be a significant factor in determining reduction to practice, we find nothing in the present record which would make the delay here of controlling significance.

■■ In summary, we think it clear that each of the experiments relied on by Breen involved the practice of every step of the process with every condition set forth in the count being met. The very breadth of the process count permits no other view. We also are satisfied that the utility of the filaments produced by the experiments was obvious at the time. We thus can only conclude that the experiments demonstrated that the process as set forth in the count was successful. The experiments thus amounted to reduction to practice since, as stated in Corona Cord Tire Co. v. Dovan Chemical Co., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610, "* * * A process is reduced to practice when it is successfully performed."

For the foregoing reasons, the decision of the Board of Patent Interferences is reversed.

Reversed.